# Exhibit C

**MASTER LEASE RECEIVABLES SALE AND ASSIGNMENT AGREEMENT**

**THIS MASTER LEASE RECEIVABLES SALE AND ASSIGNMENT AGREEMENT** is made as of May 25, 2021 between Tpine Leasing Capital LP, a limited partnership organized under the laws of the state of Delaware ("**Seller**") and Hitachi Capital America Corp, a corporation organized under the laws of the state of Delaware ("**Purchaser**").

**RECITALS**

A.      In its normal course of business, Seller provides equipment lease financing for commercial vehicles.

B.      From time to time, Seller may desire to sell and Purchaser may desire to purchase the rentals payable under certain of those leases, on the terms and conditions set forth herein.

C.      By purchasing the rentals Purchaser shall provide financial accommodations to and for the benefit of Seller.

D.      Seller will provide servicing for the purchased lease receivables and remarketing for leased equipment in accordance with the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the above premises and the representations, warranties and agreements set forth herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**SECTION 1**
**DEFINITIONS**

The following terms shall have the following meanings.  Such meanings shall be equally applicable to the singular and plural forms of the terms defined.  Unless otherwise specified, references to any section or exhibit refer to a section or exhibit of this Agreement, references to the "parties" refer to the parties to this Agreement, references to any agreement, document or instrument shall be to such agreement, document or instrument as it may be amended, restated, supplemented or otherwise modified from time to time, and references to any Person shall include its successors and permitted assigns.

"**Affiliate**" means with respect to a specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.  For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether by statute, through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agreement**" means this Master Lease Receivables Sale and Purchase Agreement and all other agreements to be executed and delivered by either Seller or Purchaser pursuant to the terms hereof including all Schedules.

"**Bank**" shall mean Bank of America, N.A., as a party to the Deposit Account Control Agreement, as defined herein.

"**Bankruptcy Code**" has the meaning set forth in Section 8.1(a).

"**Business Day**" means any day which is not a Saturday, a Sunday or a public holiday under the laws of the United States of America or the State of New York applicable to a banking association

"**Closing**" and "**Closing Date**" have the respective meanings set forth in Section 2.3.

"**Controlled Account**" shall mean the bank account established by Lessee, which account shall be subject to the Deposit Account Control Agreement.

"**Deposit Account Control Agreement**" shall mean that certain Deposit Account Control Agreement dated May 25, 2021, by and among, Seller, Purchaser and Bank.

"**Discount Rate**" means for purposes of calculating the present value of Lease Receivables on any date, the same discount rate used to calculate the Purchase Price of such Lease Receivables, which rate shall have been specified as the "**Discount Rate**" on the Schedule executed in connection with such Closing. The Discount Rate for Lease Receivables purchased in any Closing shall be equal to (i) the 3 year "**SWAP Rate**" as posted on Bloomberg.com on the Wednesday of the week prior to the date of the Closing (the "**SWAP Rate**") plus (ii) 6.40%; provided, however, if the SWAP Rate shall be less than .35%, the SWAP Rate shall be deemed to be .35%. If the SWAP Rate shall not be available on any day, then the interest rate shall be equal to (i) the Prime United States commercial lending rate as publicly announced The Wall Street Journal (the "**Prime Rate**"), on such day, plus (ii) 3.5%; provided, however, if the Prime Rate shall be less than 3.25%, the Prime Rate shall be deemed to be 3.25%. If the SWAP rate and Prime Rate are both unavailable on any calculation date, the interest rate shall be determined at Purchaser's discretion in consultation with Seller. Notwithstanding the foregoing, in no event shall the Discount Rate at any time be less than 5.00%.

"**Effective Date**" means the date that is the later of (i) the date of this Agreement as set forth in the introductory paragraph hereof or (ii) the date on which all conditions in Section 3.1 have been satisfied or waived.

"**Equipment**" means vehicles consisting of trucks, tractors and trailers and other related property leased by a Lessee under a Lease, including all replacements, replacement parts and substitutions thereto.

"**Excluded Amounts**" means all Lease Receivables paid prior to the Closing Date, unless provided otherwise in a Schedule, and amounts related to the Transferred Assets, to the extent the same arose, accrued or were payable during, or were attributable to, the period prior to the date of such Schedule. For the sake of clarity, with respect to any indemnifications or other provisions of the Leases that are and remain exercisable or otherwise for the benefit of both Seller and Purchaser after the date of a Schedule, each of Seller and Purchaser shall be entitled to the non-exclusive rights and benefits of the same to the extent such indemnifications or other provisions relate to such party (*e.g.*, a claim against or harm suffered by either such party for which an indemnification

is available under the Leases); provided, further, in no event shall Seller have any right to cancel or terminate any of the Leases, or demand any rent or liquidated damages, or take any action with respect to the Equipment or the Leases, other than enforcing the indemnification provisions under the Leases with respect to claims, losses and damages that arose on or prior to the date of transfer from the Seller to Purchaser, or except in the event of a Repurchase as provided in Section 7 hereunder.

"**Guaranty**" and "**Guarantor**" mean, respectively, an executed document guaranteeing all obligations of Seller under this Agreement and the Servicing and Remarketing Agreement. Each Guaranty and all Guaranties shall provide for joint and several liability.

"**Lease**" means a written agreement between a Lessee and Seller, specified on a Schedule, under which Seller, as lessor or financing provider, leases or provides financing for Equipment to Lessee in the United States, including all schedules, attachments or addenda attached thereto or executed or tendered in connection therewith. A "**Lease**" of trucks or tractors shall be between 24 and 72 months in length and a "**Lease**" of trailers shall be between 24 and 84 months in length, and any contracts or agreements that fall outside these terms shall be excluded from the definition of a "**Lease**" under this Agreement. The term "**Lease**" does not include any lease with respect to which Purchaser has sold or reassigned its rights to Seller under Section 6.3 of this Agreement or otherwise.

"**Lease File**" means the documents listed on Attachment B to each Schedule.

"**Lease Guaranty**" and "**Lease Guarantor**" mean, respectively, an executed document guaranteeing all or certain obligations of Lessee under a Lease, and the guarantor executing such document.

"**Lease Default**" has the meaning set forth in Section 6.2(c).

"**Lease Receivables**" of a Lease means all rent and other payments related thereto by Lessee due or to become due under such Lease for the period specified as the "**Lease Receivables Period**" for such Lease in the related Schedule, excluding (i) any late payment charges thereon or otherwise payable under the Lease to the extent that Seller has paid to Purchaser the delinquent or defaulted payment that gave rise to such late payment charges, and (ii) Excluded Amounts.

"**Lease Receivables Period**" has the meaning specified in the Schedule under which Seller sold Purchaser the related Lease Receivables.

"**Lease Supplement**" means any schedule, supplement or attachment thereof that designates any Equipment, or rent therefor, leased or financed under a Lease.

"**Lessee**" means any Person who or which is the primary obligor under a Lease (and is designated as the lessee therein).

"**Lessee Bankruptcy**" has the meaning set forth in Section 2.8(c).

"**Lessee Receivership**" has the meaning set forth in Section 2.8(c).

"**Lessor**" means the lessor under a Lease.

"**Lien**" means any lien, security interest, encumbrance, claim, title defect, charge, pledge, and other similar rights.

"**Loss Pool Reserve**" has the meaning set forth in Section 6.2(a).

"**Material Adverse Change**" means a change (as determined by Purchaser in its sole discretion) (i) that substantially threatens the business prospects or projections, operations, management, financial or other conditions of Seller, any Guarantor, or any other party to whom or which Purchaser may have recourse in regard to this Agreement, (ii) an adverse change in the industry in which Seller or any Guarantor operates, (iii) a change in control of any one of the aforesaid parties (except if consented to by Purchaser in writing) or (iv) the disruption of, or adverse change in, the equipment or vehicle leasing or lending market, or financial, banking or capital markets.

"**Notice of Assignment**" has the meaning as set forth in Section 3.2(g).

"**Payment Date**" with respect to each Lease, means the day of the month specified as the "**Payment Date**" in the Schedule listing such Lease, and if such day is not a Business Day, the next succeeding Business Day.

"**Person**" means any natural person, any entity, including without limitation, trust, corporation, estate, joint stock association, partnership, proprietorship, limited liability partnership, limited liability company, sovereign entity, government or governmental agency.

"**Purchase Price**" means the dollar amount specified in a Schedule as the purchase price for the Lease Receivables and other Transferred Assets relating to the Leases specified on such Schedule.

"**Purchaser**" has the meaning as set forth in the introductory paragraph of this Agreement.

"**Remaining Lease Receivables**" of a Lease means the sum (undiscounted) of the dollar amounts of the remaining and unpaid Lease Receivables scheduled to become due during the Lease Receivables Period for such Lease.

"**Repurchase Date**" means the date on which Seller is obligated to repurchase Lease Receivables under this Agreement.

"**Repurchase Price**" with respect to a repurchase of Lease Receivables, means the present value, as of the Repurchase Date, of the Remaining Lease Receivables for the underlying Lease, calculated using the Discount Rate. For the avoidance of doubt, for Remaining Lease Receivables that have been prepaid, in full, by a Lessee, the Repurchase Price shall be zero ($0.00).

"**Schedule**" means the document, including any attachments, executed from time to time by Seller and Purchaser, evidencing the sale and assignment of certain Transferred Assets, including Lease Receivables, to Purchaser pursuant to and under the terms and conditions of this

Agreement, which Schedule shall be substantially in the form set forth in <u>Exhibit 1</u>, with any changes agreed to by the parties.

"**Seller**" has the meaning as set forth in the introductory paragraph of this Agreement.

"**Seller's Lease Obligations**" has the meaning as set forth in Section 2.5.

"**Servicing and Remarketing Agreement**" has the meaning set forth in Section 2.6 hereof.

"**Transferred Assets**" has the meaning as set forth in Section 2.5 of this Agreement.

"**UCC**" means the Uniform Commercial Code, as adopted in any applicable jurisdiction.

## SECTION 2
## PURCHASE, TERM, AND CLOSINGS

2.1    **Purchase.**  From time to time Seller may request that Purchaser purchase Lease Receivables relating to certain Leases and Purchaser, in its sole discretion, may agree to enter into a transaction to purchase Lease Receivables by executing a Schedule with Seller specifying such Leases and Lease Receivables to be purchased.  The maximum amount of the Lease Receivables that may be purchased hereunder is Fifty Million Dollars ($50,000,000).  All Leases shall be in form and substance acceptable to Purchaser, in its sole discretion.  Attached hereto as <u>Exhibit 2</u> are the forms of the Leases and supporting documents.  Purchaser shall have sufficient opportunity to review the credit and risk and compliance profiles of all Lessees and shall approve or disapprove any Lessee or Lease in Purchaser's sole discretion in a writing to Seller within ten (10) Business Days of Seller's delivery to Purchaser of such documentation.

2.2    **Term**.  Unless renewed for an additional one year period by Purchaser, this Agreement (but not the Servicing and Remarketing Agreement) shall terminate on the one year anniversary of the date of this Agreement.  Notice of renewal shall be provided to Seller by Purchaser in writing no less than forty five (45) days prior to the termination date.  Either of Seller or Purchaser may terminate this Agreement (but not the Servicing and Remarketing Agreement) without cause on ninety (90) days prior written notice to the other party.  Either of Seller or Purchaser may terminate this Agreement with cause on thirty (30) days prior written notice to the other party, provided that, the other party shall have the right to cure the default and if the cure process is commenced and is proceeding with diligence then the termination date shall be reasonably extended to allow the cure process to be completed.  The termination of this Agreement shall not excuse completion of payment and performance obligations relating to Transferred Assets, including as provided under the Servicing and Remarketing Agreement.

2.3    **Closings.**  The closing ("**Closing**") of each purchase of Lease Receivables contemplated under this Agreement and under each Schedule will take place by delivery of the documentation required under this Agreement, together with any other documentation agreed to by the parties in writing, on the date specified in the related Schedule (the "**Closing Date**").

2.4    **Closing Payments; Maximum Advance Per Vehicle**.

(a)     The Purchase Price for each Schedule shall be as set forth on each Schedule.  With regard to Leases that have not yet been documented by Seller, unless otherwise agreed by Purchaser, the maximum advance on any vehicle comprising the Equipment under such Leases shall be equal to the lesser of: (i) 115% of the invoice amount funded by Seller and (ii) Purchaser's allowable advance rate.

(b)     At the Closing of each sale and assignment, Purchaser shall pay Seller the Purchase Price set forth in the related Schedule.  This payment shall be made by wire transfer of immediately available funds to an account designated in writing by Seller.

2.5     **Property, Rights and Interests being Sold or Assigned; Security Interest**.

(a)     In consideration of the payment of the Purchase Price specified in each Schedule, on each Closing pertaining to a Schedule, Seller shall sell, assign, convey and transfer to Purchaser, on a non-recourse basis except as expressly provided in this Agreement, and Purchaser shall purchase, to the extent set forth in this Agreement, all of Seller's right, title and interest in, under and to the following assets (the "**Transferred Assets**"):

(i)     all Lease Receivables under the Leases specified in such Schedule;

(ii)     all Lease Guaranties (if any) that guarantee Lessees' obligations to pay such Lease Receivables;

(iii)     all subleases and rents payable under the subleases, reserves, loss pools, and escrows held by Seller relating to the Leases;

(iv)     all documents in the Lease File to the extent relating to such Lease Receivables;

(v)     all of Seller's right to collect the Lease Receivables, including all remedies related thereto; and

(vi)     all proceeds of the foregoing, including insurance proceeds.

(b)     Seller retains all of its right, title and interest in, under and to all of the Equipment, except as expressly set forth in this Agreement, and nothing herein shall be construed as a sale, assignment, conveyance or transfer by Seller of its title to or ownership interest in any Equipment.

(c)     To secure (i) the payment and performance of Seller's obligations and agreements under this Agreement and the Servicing and Remarketing Agreement and (ii) the payment and performance of the obligations and agreements of Lessees under the Leases, Seller hereby (A) grants to Purchaser a continuing security interest in all of the Leases, the Equipment, and the Loss Pool Reserve and (B) assigns to Purchaser as collateral security, Seller's security interest in any Equipment leased under a Lease that is not a true lease.

(d)     Upon payment in full of all of the Remaining Lease Receivables and any amounts due from Lessees to Purchaser under the Leases and the payment and performance of Seller's obligations and agreements under this Agreement and the Servicing and Remarketing Agreement,

- 6 -

Purchaser's security interest in the Leases and the Equipment shall terminate and all of Purchaser's rights as a secured party to such Leases and Equipment shall revert to Seller.  Upon any such termination of Purchaser's security interest, Purchaser shall execute and deliver to Seller such documents as Seller may reasonably request, including without limitation UCC termination statements, to evidence such termination.  Notwithstanding the foregoing, in the event a Lease has a $1.00 purchase option or is determined by a court to be a disguised security agreement, then upon the full payment and performance of the Lessee's obligations under such Lease, Purchaser shall release its security interest and lien on the Equipment leased under such Lease.

2.6     **No Assumption of Obligations or Liabilities**.  ALL OBLIGATIONS, DUTIES, RESPONSIBILITIES AND/OR LIABILITIES ("**SELLER'S LEASE OBLIGATIONS**") UNDER THE LEASES THAT EXIST, ACCRUE AND/OR ARE INCURRED AND/OR WILL EXIST, ACCRUE OR BE INCURRED, AS THE CASE MAY BE, OR ARISE BY ACTS OR OMISSIONS OF SELLER PRIOR OR SUBSEQUENT TO THE CLOSING UNDER EACH SCHEDULE, SHALL REMAIN WITH SELLER AND CONTINUE TO BE SELLER'S OBLIGATION, AND NOTHING HEREIN SHALL BE CONSTRUED TO CONSTITUTE A TRANSFER TO OR AN ASSUMPTION BY PURCHASER OF SUCH SELLER'S LEASE OBLIGATIONS.

2.7     **Subordination**.  Seller agrees that with respect to all Leases, Seller's interest in the Equipment is in all respects subject and subordinate to Purchaser's rights in the Leases, except in the event of a Repurchase hereunder.  Until Purchaser shall have been fully paid all Remaining Lease Receivables, Seller shall be entitled to no proceeds or monies from the Equipment.

2.8     **Servicing the Leases and Remarketing**.

(a)     Purchaser shall have the right to exercise general servicing rights in connection with the Lease Receivables, including, without limitation, collection of Remaining Lease Receivables when due, and enforcement of Purchaser's rights and remedies under the Leases and/or this Agreement and any Schedule.  Notwithstanding the foregoing, pursuant to that certain Servicing and Remarketing Agreement of even date herewith (the "**Servicing and Remarketing Agreement**") between Seller and Purchaser, Seller shall exercise the servicing rights reserved to Purchaser.

(b)     As provided in the Servicing and Remarketing Agreement, Seller shall provide remarketing services to Purchaser for the Equipment.

(c)     The parties hereto acknowledge and agree that this Agreement and the Servicing and Remarking Agreement were executed in a single transaction, and shall be viewed as a singular undertaking notwithstanding the fact that they are set forth in two documents.  For the avoidance of doubt, in a Lessee Bankruptcy or Lessee Receivership, this Agreement and the Servicing and Remarketing Agreement shall be deemed to be one integrated agreement for all purposes, including assumption and rejection under Bankruptcy Code section 365 in the event that the Bankruptcy Court determines that the integrated agreement is an executory contract that can be either assumed or rejected by Seller as debtor.  The parties acknowledge that this Agreement is an agreement under which Purchaser may provide financial accommodations to and for the benefit of Seller.

2.9     **Separate and Independent Transactions**.  Each Schedule shall constitute a separate and independent sale and assignment by and between Seller and Purchaser with respect to the Leases specified therein and, subject to the next succeeding sentence, shall incorporate all terms and conditions of this Agreement.  In the event of a conflict between the terms and conditions of this Agreement and any provision of such Schedule, the provisions of such Schedule shall prevail with respect to the transactions contemplated under such Schedule only.

2.10    **Evidence of Sale and Assignment**.  Each Schedule, this Agreement and the other documents, instruments and agreements executed pursuant hereto (including the document entitled "**Sales Certificate**" in the form attached hereto as <u>Exhibit 3</u> and executed with each Schedule hereunder) shall be the operative documents evidencing the sale and assignment with respect to the Leases described in such Schedule.

**SECTION 3**
**EFFECTIVE DATE; CONDITIONS PRECEDENT; COVENANTS**

3.1     **Effective Date; Conditions Precedent**.  This Agreement shall become effective on the date on which all the following conditions shall be satisfied.

(a)     This Agreement, and all agreements, instruments, and documents required to be delivered hereunder shall be duly authorized and executed by all parties thereto and delivered to Seller and Purchaser, in form and substance reasonably satisfactory to Seller and Purchaser.

(b)     Seller and Purchaser shall have delivered to the other a fully executed certificate of incumbency and authority ("**Certificate of Incumbency and Authority**") as proof of incumbency and authorization of any representative executing this Agreement and/or any other documents on its behalf.

(c)     Seller shall have delivered to Purchaser the executed Servicing and Remarketing Agreement.

(d)     Seller shall have delivered to Purchaser Guaranties executed by the Persons listed on the <u>Guarantors' Schedule</u> attached hereto.

(e)     Seller shall have delivered to Purchaser the fully executed Deposit Account Control Agreement.

(f)     Seller shall have delivered to Purchaser evidence, in form and substance acceptable to Purchaser of:  liability insurance maintained by Seller or an Affiliate with Seller as insured or additional insured and Purchaser named as additional insured in an amount per occurrence of no less than $300,000, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee, and casualty/property damage coverage in an amount no less than $50,000 per occurrence.  Seller shall deliver to Purchaser evidence of insurance reasonably satisfactory to Purchaser.

(g)     Purchaser shall have reviewed and approved Seller's documented methods for timely processing the recording of Seller's ownership interest in and/or lien on the titles against the Equipment.

(h)      Seller shall have delivered such other instruments and documents as Purchaser reasonably requests and reasonably deems necessary or desirable to evidence, record and perfect the interests of Purchaser created herein.

3.2      **Closing Date Conditions Precedent**.   Purchaser's obligation to purchase and Seller's obligation to sell Seller's interest in the Lease Receivables and the other Transferred Assets is subject to fulfillment of each of the following conditions prior to or on the Closing Date designated on such Schedule:

(a)      Seller shall deliver to Purchaser, no less than two weeks prior to each Closing, a copy of the entire Lease File for each Lease from which the Lease Receivables being sold to Purchaser on such Closing Date arise, and Purchaser shall have reviewed and approved all the documents in the Lease File, which approval shall be in Purchaser's sole discretion.

(b)      Purchaser shall have reviewed and approved the credit and risk and compliance profiles of each Lessee under the Leases to be purchased, which approval shall be in Purchaser's sole discretion.

(c)      Each of Seller and Purchaser shall have delivered to the other prior to each Closing a current Certificate of Incumbency and Authority or a certificate stating that the information set forth in the prior delivered Certificate of Incumbency and Authority is unchanged.

(d)      All agreements, instruments, and documents required to be delivered under this Agreement, including but not limited to the Schedules, shall be duly authorized and executed by all parties thereto and delivered to Purchaser and Seller, in form and substance reasonably satisfactory to Purchaser and Seller.

(e)      There shall not have been any breach of the representations, covenants, warranties, or other agreements of the other party hereto contained in this Agreement or in any Schedule, and such representations and warranties, as well as other material information supplied by such other party, shall be true on the Closing Date.

(f)      A UCC-1 financing statement or statements covering the Transferred Assets shall have been delivered to Purchaser in form and substance reasonably satisfactory to Purchaser.

(g)      Copies of titles to all vehicles included in the Equipment (the "**Titles**"), along with copies of all completed and executed documents required to assign to Purchaser the Seller's rights, claims and interests in the Equipment and each Title.  Seller shall be listed as Owner on all Titles.

(h)      Seller shall have delivered such other instruments and documents as Purchaser reasonably requests and reasonably deems necessary or desirable to evidence, record and perfect the interests of Purchaser created herein, including but not limited to:  the written notice of the sale and assignment hereby substantially in the form of <u>Exhibit 4</u> ("**Notice of Assignment**"), prepared and duly executed by Seller for delivery by Purchaser to Lessee only as permitted herein.  Delivery of the Notice of Assignment by Purchaser to a Lessee shall be as provided in the Servicing and Remarketing Agreement.

(i)      Seller shall have delivered to Purchaser all no interest letters and lien/security interest releases required by Purchaser regarding the Transferred Assets, including, but not limited to a letter of no interest from Royal Bank of Canada, substantially in the form of <u>Exhibit 5</u>, referencing each Lease File.

(j)      No Material Adverse Change with respect to Seller shall have occurred since the execution of this Agreement.

3.3      **Covenants; Cross-Default; Default and Remedies**.

(a)      Within ten (10) days of each Closing, Seller shall deliver to Purchaser evidence that that all documents required to evidence Seller's status as owner on each Title were delivered to the appropriate state's Department of Motor Vehicles.

(b)      Within ninety (90) days of each Closing, or such other period of time as may be required for the Department of Motor Vehicles to evidence the lien, claims and interest of Seller on Title, Seller shall deliver to Purchaser (i) the original Titles evidencing Seller's position as owner on such Titles and (ii) original executed Special Power of Attorney, as described in the Servicing and Remarketing Agreement, authorizing Purchaser to transfer title and take other actions relating to the Equipment, as provided in the Servicing and Remarketing Agreement.

(c)      Seller shall notify Purchaser in writing of the formation or organization of all new Affiliates of Seller within thirty (30) days after any such formation or organization, and shall provide Purchaser with information to indicate the newly-formed Affiliate's position in Seller's organizational chart. Following such notification, Purchaser shall have the option, in its sole discretion, to require the newly-formed Affiliate (each, a "**Newly-Formed Affiliate**") to execute a joinder to a Guaranty or a new Guaranty, which joinder or new guaranty shall be delivered to Purchaser within ten (10) days following notice from Purchaser that such joinder or new guaranty is required. Upon execution of any such joinder or new guaranty, the Newly-Formed Affiliate shall be deemed an Affiliate for purposes of this Agreement.

(d)      The occurrence of a material default by any Seller Entity under any agreement between any such Seller Entity and Purchaser or Hitachi Capital Canada Corp. or any of their affiliates or subsidiaries shall be deemed a default by Seller under this Agreement and the Servicing and Remarketing Agreement.

(e)      The material failure by Seller, any Seller Entity, Seller's Affiliates and/or any Newly-Formed Affiliate to perform any of its agreements or obligations under this Agreement or the Servicing and Remarketing Agreement shall constitute a default by Seller (each, a "**Default**") under this Agreement and the Servicing and Remarketing Agreement if such failure is not cured: (i) within ten (10) days of Seller's receipt of prior written notice of default involving the payment of money or deposits to the Loss Pool Reserve or regarding the termination of insurance as required by Section 3.1(f) of this Agreement or any replacement or substitution thereof, or (ii) within thirty (30) days of Seller's receipt of prior written notice from Purchaser for all other defaults. Notwithstanding the foregoing or anything to the contrary in this Agreement or the Servicing and Remarketing Agreement, the failure of Seller to timely remit payments to Purchaser under the Servicing and Remarketing Agreement shall not require prior written notice or an opportunity to

cure and shall constitute a Default hereunder and under the Servicing and Remarketing Agreement. Nothwithstanding anything to the contrary contained herein, nothing shall give Seller an opportunity to cure any Default arising under Section 3.3(f)(i) of this Agreement.

(f)     With respect to the Lease Receivables Deposit Account, as that term is defined in the Servicing and Remarketing Agreement:  (i) Seller shall not withdraw, pay or transfer any monies from the Lease Receivables Deposit Account to any Person other than Purchaser; *provided, however,* that any and all fees and taxes related to the subject Lease to be remitted to third parties or Seller pursuant to the provisions of this Agreement may be withdrawn, paid or transferred from such Lease Receivables Deposit Account by Seller, and (ii) Seller shall not establish any "Linked Account," as that term is defined in the Deposit Account Control Agreement with the Lease Receivables Deposit Account.  Purchaser shall not issue any activation or similar notice to the bank maintaining the Lease Receivables Deposit Account that is subject to a deposit account control agreement in favor of Purchaser, unless and only during the existence of a Default hereunder.

(g)     Upon the occurrence of a Default under this Agreement, Purchaser shall be entitled to exercise its remedies under this Agreement, the Servicing and Remarketing Agreement, the Deposit Account Control Agreement and applicable law, including the UCC.

## SECTION 4
## SELLER'S REPRESENTATIONS AND WARRANTIES

4.1     With respect to each sale of Lease Receivables and the other Transferred Assets under a Schedule, Seller hereby represents and warrants to Purchaser the following, each of which shall be true, correct, accurate and complete as of the Closing Date designated on such Schedule, and each of which shall survive such Closing Date:

(a)     It is duly organized and validly existing under the laws of the state set forth in the caption.  It has the power to own its assets and to transact the business in which it is presently engaged.

(b)     It is in good standing in its state of organization.

(c)     It has the power to execute, deliver and perform this Agreement and has taken all action necessary to authorize and perform all of the transactions contemplated in this Agreement, and neither the execution, delivery and performance of this Agreement nor the undertaking of the other actions contemplated under this Agreement requires the consent, approval, authorization, order, registration or qualification of any Person or entity.

(d)     The execution, delivery and performance by it of this Agreement and any Schedule do not conflict with or result in a breach of or violate any term, condition or provision of (i) any covenant, instrument or agreement to which it is a party, (ii) its bylaws or other organizational documents, or (iii) any court or administrative order or decree.  Performance by it under this Agreement and the consummation of the transactions hereunder do not violate any local, state or federal law, statute, rule or regulation.

- 11 -

(e)      This Agreement and each Schedule executed hereunder are duly executed and delivered by it and constitute the valid and legally binding obligation of it enforceable against Seller in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies or by the exercise of the discretional powers of any court or other authority before which a proceeding may be brought seeking equitable remedies, including, without limitation, specific performance and injunctive relief.

4.2      With respect to each sale of Lease Receivables and the other Transferred Assets under a Schedule, Seller hereby represents and warrants to Purchaser that the following shall be true, correct, accurate and complete on the Closing Date specified in such Schedule, with respect to each and every Lease, the Lease Receivables of which are being sold and assigned under such Schedule:

(a)      Seller is the legal and beneficial owner of the Lease Receivables and all of the other Transferred Assets relating to each such Lease.

(b)      Each such Lease evidences the genuine, legal, valid and binding obligations of the parties thereto, enforceable in accordance with its terms against such parties, respectively, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws relating to the enforcement of creditors' rights, or the application of principles of equity.

(c)      The Lease Receivables and other Transferred Assets under each Schedule are assignable to a third party such as Purchaser under applicable law.  Except as set forth herein, none of such Lease Receivables or other Transferred Assets were assigned to any other Person or are subject to any Lien other than that created hereby.

(d)      Seller has good and valid title to all of the Equipment or, if any such Lease does not constitute a true lease, such Lease grants to Seller a valid and enforceable security interest in the Equipment leased thereunder.  Seller has not sold, assigned or otherwise disposed of or caused the creation of any Lien on the Equipment, other than any created by or pursuant to this Agreement in favor of Purchaser, or under such Lease in favor of any such Lessee, except for any existing warehouse liens as of the date of this Agreement (each, a "**Warehouse Lien**"), *provided, however,* that each Warehouse Lien against any Equipment, Lease or Lease Receivable shall be satisfied by the Purchase Price and/or other means at Closing, including by Purchaser's satisfaction of any Warehouse Lien by payment directly to any holder thereof.

(e)      Lessee has not made, asserted or threatened any setoff or defense to payment with respect to any such Lease.

(f)      Each Lease, both by its terms and in fact, commenced on or prior to the Closing Date on which Seller sold the Lease Receivables of such Lease to Purchaser.

(g)      The Lease are in substantially the same in form and substance as the Leases attached hereto as <u>Exhibit 2</u>.

**EXCEPT AS EXPRESSLY PROVIDED ABOVE, SELLER MAKES NO REPRESENTATION OR WARRANTY, AND SHALL HAVE NO RESPONSIBILITY, AS TO THE VALIDITY OR COLLECTABILITY OF THE LEASE RECEIVABLES OR OTHER PAYMENTS RELATING THERETO.**

## SECTION 5
## PURCHASER'S REPRESENTATIONS AND WARRANTIES

5.1     With respect to each sale of Lease Receivables and the other Transferred Assets under a Schedule., Purchaser hereby represents, covenants and warrants to Seller the following, each of which shall be true, correct, accurate and complete as of the Closing Date designated on such Schedule, and each of which shall survive such Closing Date:

(a)     Purchaser is duly organized and validly existing under the laws of the state set forth in the caption and Purchaser has the power to own its assets and to transact the business in which it is presently engaged.

(b)     Purchaser is in good standing in the state of its incorporation.

(c)     Purchaser has the power to execute, deliver and perform this Agreement and has taken all action necessary to authorize and perform all of the transactions contemplated by this Agreement.   Neither the execution, delivery and performance of this Agreement nor the undertaking of the other actions contemplated under this Agreement requires the consent, approval, authorization, order, registration or qualification of any Person or entity.

(d)     The execution, delivery and performance by Purchaser of this Agreement and any Schedule do not conflict with or result in a breach of or violate any term, condition or provision of (i) any covenant, instrument or agreement to which Purchaser is a party, (ii) Purchaser's bylaws, charter or other organizational documents, or (iii) any court or administrative order or decree. Performance by Purchaser under this Agreement and the consummation of the transactions hereunder do not violate any local, state or federal law, statute, rule or regulation.

(e)     This Agreement and each Schedule has been duly executed and delivered by Purchaser and constitutes the valid and legally binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies or by the exercise of the discretional powers of any court or other authority before which a proceeding may be brought seeking equitable remedies, including, without limitation, specific: performance and injunctive relief.

(f)     Purchaser has made its own independent investigation of the financial condition of each Lessee, and it has made its own independent assessment of the creditworthiness of such Lessee.

(g)     Upon indefeasible payment in full of all of the Lease Receivables for all Leases, Purchaser shall deliver to Seller the Lease Files and all related documents accumulated by Purchaser since the original sale and assignment.

- 13 -

### SECTION 6
### PAYMENTS AND LOSS POOL RESERVE

6.1     **Payments**.  All payments of Lease Receivables shall be made by Lessees to the Controlled Account, as provided in the Servicing and Remarketing Agreement.  Remittance of payments of Lease Receivables by Seller to Purchaser shall be made according to the Servicing and Remarketing Agreement.  Seller shall hold all payments of Lease Receivables in trust for the benefit of Purchaser.  No payments of Lease Receivables shall be commingled with any other funds of Seller.

6.2     **Loss Pool Reserve**.

(a)     A loss pool reserve account (the "**Loss Pool Reserve**") shall be maintained by Purchaser as a notional account maintained by Purchaser on its general ledger.  As provided in Section 2.5(c) hereof, the Loss Pool Reserve secures the payment and performance of the obligations and agreements of Lessees under the Leases and the payment and performance of the obligations and agreements of Seller under this Agreement and the Servicing and Remarketing Agreement.

(b)     The initial deposit in the Loss Pool Reserve shall be $500,000, which amount shall be funded from a holdback in payment of the Purchase Price.  Additional deposits in the Loss Pool Reserve shall be equal to twenty percent (20%) of the Purchase Price of the Leases, which amounts shall be funded from holdbacks by Purchaser from the Purchase Price paid at Closings.

(c)     In the event of a Lease Default, and/or a prepayment as contemplated in 3.07 of the Servicing and Remarketing Agreement that is insufficient to satisfy the Remaining Lease Receivables in full, Purchaser shall apply funds from the Loss Pool Reserve, as provided herein, on no less than ten (10) days prior written notice to Seller.  As used herein, a "**Lease Default**" shall occur when (i) a payment of a Lease Receivable is greater than ninety (90) days past due, (ii) in the event of a default in payment of one or more of the first three (3) Lease Receivable payments following a Closing or (iii) the occurrence of any other event of default under a Lease that is not cured within the applicable grace period under the Lease. In connection with any Lease Default, the amount of funds applied from the Loss Pool Reserve shall be equal to the Remaining Lease Receivables as of the Lease Default, discounted to present value by application of the Discount Rate.

(d)     In the event of a default by Seller under this Agreement or the Servicing and Remarketing Agreement, to the extent such default can be cured by the payment of money, Purchaser shall apply funds from the Loss Pool Reserve in the amount necessary to cure such default.  In the event of a Lease Default, Seller's liability cannot exceed the amount of the Loss Pool Reserve, provided, however, that nothing contained herein shall relieve Seller from maintaining the Required Balance, as set forth below.

(e)     At all times until the payment in full of all of the purchased Lease Receivables and the performance of all of the obligations and agreements of Seller under the Servicing and Remarketing Agreement, the balance of the Loss Pool Reserve must be equal to the greater of $500,000.00 or 20% of the net book value of all purchased Lease Receivables (the "**Required Balance**").  In the event the balance drops below such amount, including after the disposition of

funds from the Loss Pool Reserve in accordance with Section 6.2(d) hereof, Purchaser shall notify Seller in writing (and shall provide backup calculations) and Seller shall remit to Purchaser within ten (10) days thereafter the amount required to bring the Loss Pool Reserve to the Required Balance.

(f)     Amounts in the Loss Pool Reserve may be released to Seller beginning six (6) months after the date of this Agreement if, based on Purchaser's analysis of the Loss Pool Reserve, Purchaser determines that, as of any calendar quarter end, the amount of the Loss Pool Reserve is greater than 20% of the net book value of the purchased Lease Receivables, but not less than $500,000, provided, however, that Purchaser shall not be obligated to release to Seller any portion of the Loss Pool Reserve if such release would result in the Loss Pool Reserve decreasing below $500,000 or 20% of the net book value of the purchased Lease Receivables.   The failure of Purchaser to timely release funds from the Loss Pool Reserve shall be a default by Purchaser under this Agreement.

**SECTION 7**
**REPURCHASE**

7.1     **Right to Require Repurchase**.  In the event: (a) of any material inaccuracy in or breach of any representation or warranty made by Seller hereunder with respect to a particular Schedule or Lease, that has not been remedied or cured by Seller, or (b) with regard to a Schedule, Seller fails to timely deliver the original Titles to Purchaser and the executed Special Power of Attorney, then upon fifteen (15) days' written demand from Purchaser, Seller shall repurchase the Remaining Lease Receivables and any other Transferred Assets relating to such Schedule or Lease, as the case may be, for an amount equal to the Repurchase Price (a "**Repurchase**").  In addition, Seller shall reimburse Purchaser upon demand for all reasonable collection costs (including, without limitation, reasonable attorneys' fees) in collecting the Repurchase Price from Seller. Immediately upon Purchaser's receipt of the Repurchase Price from Seller, together with any other amounts due Purchaser from Seller under this Agreement with respect to the Remaining Lease Receivables being repurchased, Purchaser shall: (i) sell and reassign such Remaining Lease Receivables and any other related Transferred Assets (and all of Purchaser's right, title and interest in and to the property and rights thereunder) to Seller without representation or warranty (express or implied) and without recourse to Purchaser, except that Purchaser shall, upon the request of Seller, warrant that: (A) Purchaser is the legal and beneficial owner of such Remaining Lease Receivables and Transferred Assets, (B) that the Lease Receivables and other Transferred Assets are free and clear of any Liens created by or through Purchaser, and (C) that Purchaser has the authority to sell and assign such Lease Receivables and other Transferred Assets; (ii) reimburse Seller for any funds applied by Purchaser from the Loss Pool Reserve relating to such Schedule or Lease which were not accounted for in the calculation of the Repurchase Price; (iii) execute and deliver any documents reasonably requested by Seller to evidence such sale and reassignment; and (iv) deliver to Seller the related Lease File and all related papers and documents accumulated by Purchaser since the time of the original sale and assignment to Purchaser.

## SECTION 8
## MISCELLANEOUS

8.1 **Complete Agreement**. This Agreement (together with the Servicing and Remarketing Agreement and all other agreements to be executed by the parties hereunder) contains the full and complete agreement between the parties on the subject matter set forth herein and supersedes all other prior written agreements and understandings between the parties, including, without limitation, any proposals, term sheet, letter or letters of intent executed by the parties.

8.2 **Governing Law**. THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY ANI) PERFORMANCE, BUT WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAWS, AND IS BEING DELIVERED IN NEW YORK. EACH OF THE PARTIES HERETO SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS OF NEW YORK, COUNTY OF NEW YORK, TO RESOLVE ALL ISSUES THAT MAY ARISE OUT OF THIS AGREEMENT.

8.3 **Modifications**. This Agreement may not be modified except by a writing signed by authorized representatives of the parties.

8.4 **Failure/Delay in Exercising Remedies**. No failure or delay on the part of Purchaser or Seller in the exercise of any power, remedy or right conferred in this Agreement and no course of dealing between Purchaser and Seller; shall operate as a waiver of such power, remedy or right.

8.5 **Notices**. Any notice hereunder to Purchaser or Seller shall be in writing, and shall be deemed to have been validly delivered (a) one (1) Business Day after deposit with a reputable overnight mail, (b) when delivered, if hand-delivered by messenger, or (c) when delivered via email as a pdf, with the original sent via overnight mail, all of which shall be properly addressed to the party to be notified and sent to the address or number indicated as follows:

> to Seller:
>
> Tpine Leasing Capital LP
> 34880 Lyndon B. Johnson Fwy
> Dallas, TX 75241
> Attn:  Chris Petersen
> E-mail:  chris@pridegroupenterprises.com
>
> to Purchaser:
>
> Hitachi Capital America Corp.
> 800 Connecticut Avenue, 4th Floor North
> Norwalk, Connecticut 06854-1631
> Attention: Ms. Kim Morse
> Email:  kmorse@hitachicapitalamerica.com

- 16 -

8.6     **Binding on Successors; Assignment**.  This Agreement will be binding upon and inure to the benefit of the parties' respective successors and permitted assigns.  Purchaser may assign this Agreement, including its rights, title and interests in the Lease Receivables and the other Transferred Assets and delegate its duties and obligations hereunder without the consent of Seller.  Seller may not assign this Agreement or delegate any of its duties or obligations hereunder without obtaining the prior written consent of Purchaser.  Purchaser hereby notifies Seller of the contemplated transfer by merger pursuant to the publicly announced merger between Mitsubishi UFJ Lease & Finance Co. Ltd. and Hitachi Capital Corporation (Japan) (the "**MUFG Merger**").

8.7     **Survival of Indemnities**.  All indemnities under this Agreement and the Servicing and Remarketing Agreement shall survive the termination of either or both of this Agreement and the Servicing and Remarketing Agreement.

8.8     **Cumulative Remedies; LIMITATION ON DAMAGES**.  The remedies of a party provided by this Agreement are cumulative and not exclusive, and may be exercised at the same time or at different times, and are in addition to and not in lieu of additional remedies, if any, which may be provided by law or in equity.  **NEITHER PURCHASER NOR SELLER SHALL HAVE ANY LIABILITY UNDER THIS AGREEMENT FOR CONSEQUENTIAL DAMAGES**.

8.9     **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

8.10    **No Third-Party Beneficiaries**.  Nothing stated in this Agreement shall be construed to grant any rights to, or confer the status of third-party beneficiary upon, any third person or entity.

8.11    **JURY TRIAL WAIVER. EACH OF PURCHASER AND SELLER HEREBY IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING (INCLUDING ANY COUNTERCLAIM) OF ANY TYPE IN WHICH PURCHASER OR SELLER ARE PARTIES AS TO ALL MATTERS ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED IN CONNECTION HEREWITH.**

**(the remainder of this page is intentionally blank)**

IN WITNESS WHEREOF, Purchaser and Seller, through their respective authorized representatives, have set their hands to this Agreement on the date first written above.

**HITACHI CAPITAL AMERICA CORP.,**
as Purchaser

By: _____
Name: S. Kirk Mann
Title: SVP & GM

**TPINE LEASING CAPITAL LP,**
as Seller

By: _____
Name: _____
Title: _____

- 18 -

IN WITNESS WHEREOF, Purchaser and Seller, through their respective authorized representatives, have set their hands to this Agreement on the date first written above.

**HITACHI CAPITAL AMERICA CORP.,**
as Purchaser

By: _____
Name: _____
Title: _____

**TPINE LEASING CAPITAL LP,**
as Seller

By: _S. Johal_____
Name: _Sulakhan Johal_
Title: _President_

- 18 -

GUARANTORS' SCHEDULE

Sulakhan Johal, an individual

Jasvir Johal, an individual

Pride Fleet Solutions Inc. (formerly known as Pride Diesel Inc.) (Canada)

Pride Group Holding Inc. (Canada)

Pride Group Logistics Ltd. (Canada)

Pride Truck Sales Ltd. (Canada)

Tpine Truck Rental Inc. (Canada)

Tpine Leasing Capital Corporation (Canada)

2043002 Ontario Inc. (Canada)

2076401 Ontario Inc. (Canada)

Pride Truck Sales LP (US)

TPine Rental USA (US)

EXHIBIT 1

SCHEDULE NO.___

This Schedule No. ___ ("**Schedule**") between Tpine Leasing Capital LP("**Seller**") and Hitachi Capital America Corp. ("**Purchaser**") is dated _____, and is a Schedule to the Agreement (defined below).

Reference is made to that certain Master Lease Receivables Sale and Assignment Agreement dated as of April __, 2021, between Seller and Purchaser (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**"). Capitalized terms used herein without definition shall have the meanings attributed to them in the Agreement.

Seller hereby offers a sale and assignment to Purchaser of the Lease Receivables and Transferred Assets relating to the Leases specified on Attachment A hereto as contemplated by Section 2.3 of the Agreement, and Purchaser agrees to such sale and assignment, subject to the Agreement and the following terms:

(a)     The Purchase Price of such sale and assignment shall be $____.

(b)     The Discount Rate used to calculate such Purchase Price is ____% per annum.

(c)     The Leases relating to such sale and assignment are listed on Attachment A hereto.

(d)     The Closing Date of such sale and assignment shall be _____.

(e)     The Payment Date for remittance by Seller to Purchaser of such Lease Receivables is the _____ Business Day of each calendar month.

(f)     The Lease Receivables Period for each such Lease is from ____, 20__ to [the end of the related Lease's scheduled term set forth in Attachment A hereto].

No Event of Termination has occurred and is continuing, or would result from the sale and assignment contemplated by this Schedule. As of the date hereof, Seller has performed in all material respects all of the agreements contained in the Agreement to be performed by it on or prior to such date.

IN WITNESS WHEREOF, the undersigned have caused this Schedule to be duly executed this ____ day of _____, 20____.

**Tpine Leasing Capital LP, as Seller**

By: _____

Name: _____

Title: _____


**Hitachi Capital America Corp., as Purchaser**

By: _____

Name: _____

Title: _____

ATTACHMENT A TO SCHEDULE NO._____

| Master Lease Number | Lease Supplement Number | Name of Lessee | Monthly Payment | Number of Payments Sold to Purchaser | Original Term in Months | End of Lease Date |
|---|---|---|---|---|---|---|

**ATTACHMENT B TO SCHEDULE NO.____**

[Lease file]

EXHIBIT 2

FORM OF LEASES





Proud Member Of

**Equipment Lease Option to Purchase**

TPine Leasing Capital, L.P. | 1125 E. Alexis Road | Toledo, OH.  43612

**Date:    January 0, 1900**

Customer Name:    **0**

Mailing Address:    **0 0 0, 0**

Lease Number:    **0**                    **JIRA#    0    TIB:    0**

Equipment Desc:    **VIN#**

**DOCUMENTATION REQUIREMENTS FOR FUNDING  (PLEASE ALIGN FUNDING PACKAGE IN THE ORDER DETAILED**

**SEQ**

| SEQ | | |
|---|---|---|
| 1 | ☐ | EXECUTED LEASE DOCUMENTS & ACH AGREEMENT |
| 2 | ☐ | VOID CHECK, **MUST BE IN NAME OF LESSEE OR PG ONLY (NO TEMP CHECKS) ADD AFTER ACH AGREEMENT** |
| 3 | ☐ | FUEL CARD APPLICATION |
| 4 | ☐ | NOTARIZED CONTINUING GUARANTY |
| 5 | ☐ | NOTARIZED POWER OF ATTORNEY |
| 6 | ☐ | NEW FREIGHTLINER SERVICE AGREEMENT (IF APPLICABLE) |
| 7 | ☐ | SCHEDULE B **(MUST BE INCLUDED FOR ALL NEW FREIGHTLINERS)** |
| 8 | ☐ | VOLVO REQUIRED DOCUMENTS (IF APPLICABLE) |
| 9 | ☐ | FIRST AMERICAN REQUIRED DOCS (IF APPLICABLE) |
| 10 | ☐ | SERVICE LEASE AGREEMENT - RIDER |
| 11 | ☐ | DEALER INVOICE **(TPINE RENTAL USA OR PRIDE)** AND TVALUE |
| 12 | ☐ | COPY OF DOWN PAYMENT, **MUST BE FROM LESSEE OR PG ONLY (DEPOSITS CANNOT BE ACCEPTED)** |
| 13 | ☐ | COPY OF ACTUAL CREDIT CARD USED FRONT AND BACK **(MUST BE IN LESSEE OR PG NAME)** |
| 14 | ☐ | COPY OF SIGNED & DATED CREDIT APPLICATION **(LESS THAN 60 DAYS OLD)** |
| 15 | ☐ | EXPERIAN & PAYNET REPORTS **(LESS THAN 30 DAYS OLD)** |
| 16 | ☐ | COPY OF DRIVER'S LICENSE - **FOR ALL SIGNERS (MUST NOT BE EXPIRED)** |
| 17 | ☐ | COPY OF SOCIAL SECURITY CARD - **FOR ALL SIGNERS** |
| 18 | ☐ | PROOF OF RESIDENCY-(RED/GREEN CARD, USA PASSPORT, NATURALIZAITON CERT.) **(MUST NOT BE EXPIRED)** |
| 19 | ☐ | SEC OF STATE DOCS (PRINTOUT OF "ACTIVE" STATUS & WHO THE OFFICERS/MEMBERS ARE) |
| 20 | ☐ | PROOF OF EIN FOR COMPANY  (IRS LETTER OR COMPANY TAX RETURN) |
| 21 | ☐ | INSURANCE CERTIFICATE(S) **(SEE INSURANCE REQUIRMENTS ON NEXT PAGE)** |
| 22 | ☐ | COPY OF FRONT & BACK OF TITLE |
| 23 | ☐ | COPY OF TITLE APPLICATION |
| 24 | ☐ | TAX EXEMPTION FORMS - **(SEE TAX EXEMPTION FORM REQUIREMENTS ON NEXT PAGE)** |
| 25 | ☐ | GPS installed and pinged |

**TITLE REQUIREMENTS**

NOTE: Each vehicle listed on the Lease Option to Purchase must be titled with the following as lien holder

**TPine Leasing Capital, L.P. (AS OWNER/LESSOR)**

**1125 E. Alexis Road, Toledo, Ohio 43612**

**Attention: Chris Petersen**





Proud Member Of

Lease Number        0

**INSURANCE REQUIREMENTS**

☐ Certificate of Insurance ***must*** include the following: Certificate Holder for each company listed below exactly as it appears and must include each as "**Additional Insured**" & "**Loss Payee**".

**TPine Leasing Capital, L.P. ISAOA**

**1125 E. Alexis Road, Toledo, Ohio 43612**

☐ Insurance Certificate must include **Lessee Name** listed as the **Insured** or as **additional insured**
☐ Certificate must include physical damage coverage amount $ for all equipment, max deductible of $2,500
☐ Coverage of equipment should reflect **a stated amount $$ equal to or greater than the**
   **Total Cost found on the lease agreement**
☐ Liability coverage must be greater than or equal to $1,000,000.00 **(NON-TRUCKING LIABILITY ONLY IS NOT ACCEPTABLE)**
☐ Complete list of collateral description including Vehicle Identification Number (VIN)
☐ Insurance Certificate must include carrier name, broker/agency and address
☐ Policy numbers must be listed on COI, (TBD as a policy number cannot be accepted).
☐ All COI's must be valid for at least 30 days prior to expiration.

**Tax Exemption Form(s) Requirements:**

| FORM REQUIRED: | TEMPLATE | FORM COMMENT |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |





Proud Member Of

**Pay Proceeds Invoice**

TPine Leasing Capital, L.P. | 1125 E. Alexis Road | Toledo, Ohio 43612

**Lease Number:  0**
**Date of Agreement:_**                **January 0, 1900**

TPine Leasing Capital, L.P. is irrevocably instructed to disburse payment as follows:

**Payee (s):**

   TPine Rental USA, Inc.

   TPine Leasing Capital, L.P.

**Item (s):**
($1,050.00)                    To:   TPine Rental USA, Inc.


$1,050.00                    To:   TPine Leasing Capital, LP


**Total Amount Financed after down payment:**
$0.00




**Dated:** _____**January 0, 1900**_____

**Lessee:** _____**0**_____


**By:** _____

**Title:** _____**DIRECTOR**_____





Proud Member Of

## Titled Equipment Agreement and Acknowledgement
TPine Leasing Capital, L.P. | 1125 E. Alexis Road | Toledo, Ohio 43612

**Lease Number:**           **0**
**Date of Agreement:**      **January 0, 1900**
**Lessee Name:**            **0**
**Address:**                **0 0 0,  0**

**Equipment Description:**
**Reefer Serial Number:**       **N/A**

**The Equipment must be titled as follows:**

**Owner/Lessor Name & Address:**          TPine Leasing Capital, L.P. 1125 E. Alexis Road Toledo, Ohio 43612

**Lienholder Name & Address:**

**TPine Leasing Capital, L.P. (AS OWNER/LESSOR)**        **1125 E. Alexis Road, Toledo, Ohio 43612**
**Attention: Chris Petersen**
PLEASE NOTE: The legal name of the Customer must be used on all title applications or documentation submitted to the State for titling purposes. AS AN EXCEPTION, the title may include the doing business as ("DBA") or trade name. If the DBA or trade name is to be listed on the certificate of title, the legal name must appear first followed by the DBA name or trade name (i.e. John Doe dba John Doe's Leasing).

In addition, Co-Borrowers' certificate(s) of title must include both Borrowers' names as Owners with the word "AND" between their names. The word "OR" is unacceptable and must be corrected at the Titling Party's expense.

**Party Responsible for Titling (check one):**
o   Customer will personally submit title work to state for processing
o   Dealer will submit title work to state for processing
o   Titling agency or other third party will submit title work to state for processing

By signing below, I agree (1) to title the Equipment as set forth above; (2) that even if not personally submitting the title work to state, I am responsible for ensuring that the Titling Party designated above will apply for title(s) immediately upon disbursement of funds; (3) I have confirmed that the current party holding the original title(s) or Certificate(s) of Origin for the titled equipment referenced above will deliver them to my designated Titling Party immediately upon funding; and (4) Titling Party agrees to send a copy of the processed title application receipt as endorsed by the applicable State to the address set forth below within thirty business days of funds being disbursed:

**Dated:** _____**January 0, 1900**_____

**Lessee:** _____**0**_____

**By:** _____

**Title:** _____**DIRECTOR**_____





Proud Member Of

| COMMERICAL MOTOR VEHICLE WAIVER AGREEMENT | | | |
|---|---|---|---|
| Waiver Lease Number: | 0 | | |
| Lessor: | TPINE LEASING CAPITAL, L.P. | | |
| Lessor Address: | 1125 E. ALEXIS ROAD, TOLEDO, OH 43612 | | |
| Debtor: | 0 | | |
| Debtor Address: | 00 0 0 | | |
| Equipment Description: | | | |
| Leasing Company: | TPINE LEASING CAPITAL, L.P. | MILEAGE: | 0 |
| Finance Amt.: | $                    - | Lease Period (months): | 0 |
| Purchase Price: | $          (1,050.00) | Down Payment: | 0 |
| Waiver Agreement Fee: | $                    - | Date: | 1/0/1900 |
| Debtor/Lessee hereby accepts: | NO | Option Selected: | GAP |

**Although the Debtor/Lessee is not required to do so, the Debtor/Lessee hereby agrees to amend the early termination provisions of the Loan/Lease Agreement for the above referenced vehicle/equipment dated the date hereof.**

**SECTION A – DOWN PAYMENT**

Under the terms of such Loan/Lease Agreement, as amended by this Waiver Agreement, if such financed/leased vehicle/equipment is deemed a "Total Loss"/"Total Write-Off" by the Debtor/ Lessee's primary automobile insurer (providing the vehicle/equipment physical damage insurance which the Debtor/Lessee is required to maintain at all times under the terms of such Loan/Lease Agreement), the Lender/Lessor shall apply a credit equal to the down payment paid on such vehicle/ equipment towards the purchase of another vehicle/equipment, provided that the replacement vehicle/equipment is arranged through the Lender/Lessor, or as otherwise agreed to in writing by the Lender/Lessor. Such replacement vehicle/equipment must be registered by the owner with the appropriate state licensing authority, be safety certified according to state standards, and be of a similar class and application as the "Total- Loss"/ "Total Write-Off", unless agreed to in writing by the Administrator. This credit will only be applied in the first thirty-six (36) months of the Loan/ Lease Agreement as follows:

**1.**  During the first twelve (12) months of the Loan/Lease Agreement: one hundred percent (100%) of the down payment (as indicated in the Schedule of this Waiver Agreement) applied to the purchase of such vehicle/equipment covered by this waiver agreement to a maximum of thirty thousand dollars ($30,000).

**2.**  During the second twelve (12) months of the Loan/Lease Agreement: seventy-five percent of the down payment (as indicated in the Schedule of this Waiver Agreement to a maximum of twenty-two thousand five hundred only ($22,500).

**3.**  During the third twelve (12) of the Loan/Lease Agreement: fifty percent (50%) of the down payment (as indicated in the Schedule of this Waiver Agreement) applied to the purchase of such vehicle/equipment covered by this Waiver Agreement to a maximum of fifteen thousand dollars ($15,000).

**The maximum credit to be applied is limited to the lesser of:**

(a)  The down payment applied to the purchase of such vehicle/equipment to the maximum as stipulated in 1., 2. and 3. above, as applicable; or

(b)  The difference between the original purchase price of such vehicle/equipment and the Debtor/Lessee's physical damage insurance company total loss settlement.





Lease Number       0

**SECTION "B" GAP**

Under the terms of such Loan/Lease Agreement, as amended by this Waiver Agreement, if such financed/leased vehicle/equipment is deemed a "Total Loss"/"Total Write-Off" by the Debtor/ Lessee's primary automobile insurer (providing the vehicle/equipment physical damage insurance which the Debtor/Lessee is required to maintain at all times under the terms of such Loan/ Lease Agreement), the Debtor/Lessee's maximum liability to the Lender/Lessor under such Loan/ Lease Agreement shall be the "Actual Cash Value" of the vehicle/equipment as defined below, plus any delinquent payments and all past due charges at the time of such loss. If the Loan/Lease of another through the Lender/Lessor, the Debtor/Lessee will be entitled to reimbursement, to a maximum of five thousand dollars ($5,000), of the physical damage deductible paid by the Debtor/Lessee under the vehicle/equipment physical damage insurance (which the Debtor/Lessee is required to maintain at all times under the terms of such Loan/Lease Agreement). Such replacement vehicle/equipment must be registered by the owner with the appropriate state licensing authority, be safety certified according to state standards, and be of a similar class and application as the "Total-Loss"/ "Total Write-Off", unless agreed to in writing by the Lender/Lessor. The final settlement amount will be the difference between the Actual Cash Value, plus any delinquent and past due charges, and the discounted value of the remaining payments as stipulated in the Loan/Lease Agreement. Where no discount is provided for in the Loan/Lease Agreement or the discounted rate is less than that used in the Loan/Lease Agreement, the Lender/Lessor reserves the right to discount the remaining payments using a discounted interest rate that is equal to or less than the lease rate or loan interest rate used on the effective date of the Loan/Lease Agreement. "Total Loss"/"Total Write-Off" are understood as being when the vehicle/equipment is stolen and not recovered within twenty (20) days from the date of disappearance or when the cost of repair exceeds the "Actual Cash Value" of the vehicle/equipment as defined below.

"Actual Cash Value" means the greater value of the vehicle/equipment as set by the physical damage insurance adjuster or the "Retail" value as per the Black Book for the month in which the vehicle was written-off, where applicable, or failing the latter, the value as determined by an independent appraiser approved by the Lender/Lessor.

All proceeds that the Debtor/Lessee may recover or be entitled to recover from taxes on the purchase of the vehicle/equipment or from the cancellation of any items such as warranties, service contracts, credit life and/or disability insurance that were included in the Loan/ Lease Agreement will be paid directly to the Lender/Lessor, in order to determine the remaining balance on the loan/lease.  Non-refundable warranties and/or non- refundable service contracts are to be excluded from the Purchase Price and Finance Amount as they are not covered by this waiver.

It is understood that such vehicle/equipment shall be replaced within a six (6) month period from the date of the "Total Loss"/ "Total Write-Off" in order to qualify for the Down Payment and/or Deductible section(s) of this Waiver Agreement.

This Waiver Agreement is NOT transferable to another vehicle/equipment or person or corporate entity. This Waiver Agreement does NOT have any value OTHER THAN when this Waiver Agreement is redeemed (subject to the conditions listed herein) by the Lender/Lessor. The Debtor/Lessee has thirty (30) days from the effective date of this agreement to cancel the agreement. Cancellation requests must be received in writing by  Lender/Lessor at the address below.





Lease Number        0

Assignment of such Loan/Lease Agreement by the Lender/Lessor shall not in any way affect the amendment of such Loan/Lease Agreement provided for in this Waiver Agreement.

The Debtor/Lessee is required to maintain a primary insurance policy and will lose all the benefits under the Waiver Agreement if they fail to maintain the required physical damage coverage. The Waiver Agreement will never act as primary automobile physical damage insurance. This Waiver Agreement is only valid for losses occurring in the continental United States. All currency referred to herein shall be in U.S. currency.

Lender/Lessor reserves the right to deny any claim in which the Purchase Price of the vehicle listed on this Waiver Agreement was not in line with current market value at the time of purchase/lease, and may require a copy of an approved appraisal if the financed/leased vehicle/equipment is greater than seven (7) years from the date of manufacture, or has an excess of one-million, two hundred thousand miles(1,200,000 mi) at the time of sale, or was acquired through a private sale.

**EXCLUSIONS**

This Waiver Agreement does not provide coverage for:

1.      Any "Total Loss"/"Total Write-Off" of the vehicle/equipment directly or indirectly caused by the Waiver Agreement holder or any individual with permission to possess the covered vehicle/equipment while committing or attempting to commit a criminal act or if the operator of the vehicle was impaired at the time of the accident.
2.      Automobiles.
3.      Vehicles/equipment for public use such as police cars, taxis, limousines, courier or similar delivery vehicles, buses.
4.      Vehicles/equipment used by government or municipal services.
5.      Vehicles/equipment for which the amount to finance/lease exceeded four hundred thousand dollars ($400,000).
6.      Exhibition or racing vehicles.
7.      Short term rental vehicles.
8.      Light vans other than original manufacturer's models with standard equipment. Motorhomes or RV vehicles.

Notwithstanding anything contained herein, Debtor/ Lessee will look only to Lender/Lessor, for any performance, credit or other agreement by Lender/Lessor hereunder. Debtor/Lessee acknowledges that Lender/Lessor may assign the Loan/Lease Agreement to a third party (an "Assignee") without notice to Debtor/Lessee. Anything herein to the contrary notwithstanding, Lender/Lessor, and not any Assignee, is responsible for all Lender/Lessor's agreements herein and any Assignee does not assume any obligations or liabilities hereunder. The Loan/Lease Agreement provides Lessee's obligations are absolute and unconditional, all payments and other performance by Debtor/Lessee under the Loan/Lease Agreement shall be paid or performed without set off or counterclaim, and that Debtor/Lessee waives any defense, counterclaim or right of set off against any Assignee. Nothing herein changes such agreements and Debtor/Lessee may not exercise any set off, defense, counterclaim or take other action against any Assignee due to a claim against Lender/Lessor under this Waiver.





Lease Number         0

**WAIVER CLAIM PROCEDURES**

At the time of early termination of such Loan/Lease Agreement due to the "Total Loss"/ "Total Write- Off" of such vehicle/equipment, the Debtor/Lessee shall provide to the Lender/Lessor the following information:

1.      Copy of this Waiver Agreement.
2.      Copy of Original Bill of Sale for Financed Vehicle/Equipment, copy of original Lease Agreement for Leased Vehicle/Equipment.
3.      If part or the entirety of the down payment on the vehicle/equipment was paid in cash, the dealer may be asked for a bank record of this cash deposit before a claim can be settled.
4.      Copy of Vehicle/Equipment Certificate of primary automobile insurance.
5.      Copy of the Debtor/Lessee's primary automobile insurer's total loss settlement statement for such loss. This is the physical damage insurance adjuster's report detailing components, the cost to repair and should clearly
6.      Copy of the police report.
7.      Copy of Account from the Lending Institution/Leasing Company showing the remaining balance on the Loan/Lease.
8.      Copy of the automobile insurer's actual cash value calculations.

The Debtor/Lessee must advise the Lender/Lessor of a potential claim in writing no more than thirty (30) days after the potential claim occurred. Any claims reported after this period shall be denied. The undersigned Debtor/Lessee has read this Waiver Agreement and its provisions and acknowledges that no verbal representations have been made which differ from these provisions.

This agreement shall in all respects by governed by, and construed in accordance with the substantive laws of the state of Ohio. The party's consent to the jurisdiction of the Court of Common Pleas, Lucas County, Ohio. TIME IS OF THE ESSENCE WITH RESPECT TO THE OBLIGATIONS OF DEBTOR/LESSEE UNDER THIS AGREEMENT. DEBTOR/LESSEE HEREBY WAIVES ANY RIGHT TO A JURY TRIAL WITH RESPECT TO ANY MATTER UNDER OR IN CONNECTION WITH THIS AGREEMENT.

**Debtor/ Lessee:**    0 _____        Per: _____

**Lender/ Lessor:**    TPINE LEASING CAPITAL, L.P. _____        Per: _____





# Motor Vehicle Lease Agreement

Lease Number                    0

**Acceptance Date:**          January 0, 1900
Name and Address of Lessee   **0**
                             **0 0 0, 0**

**Motor Vehicle Description:** (year, make, model, type, serial number, attachments):

**Reefer Serial Number:**      **N/A**
**Motor Vehicle Location:**    **0 0 0, 0**
After Lessee signs this Lease, Lessee authorizes Lessor to insert any missing information or change any inaccurate information  (such as the model year of the motor vehicle or its serial number or VIN) into this Motor Vehicle Description.

**Lease Provisions**

1.   LEASE. Lessee hereby agrees to lease from Lessor, the personal property described on the first page of this Lease on the terms and conditions set forth herein (such property together with all replacements, substitutions, parts, improvements, repairs, and accessories and all additions incorporated therein or affixed thereto being referred to herein as the "Motor Vehicle"). Lessee's execution of this Lease shall obligate Lessee to lease the Motor Vehicle from Lessor. This Lease shall not be binding on Lessor unless and until executed by Lessor. Anything to the contrary notwithstanding, Lessor shall have no obligation to accept, execute or enter into this Lease or to acquire or lease to Lessee the Motor Vehicle. Lessee grants Lessor a security interest in the Motor Vehicle to secure its obligations under this Lease and all other indebtedness at any time owing by Lessee to Lessor.

2.   MOTOR VEHICLE ACCEPTANCE; TERM; RENT. The "Acceptance Date" for the Motor Vehicle shall be (a) the date Lessee accepts the Motor Vehicle under a separately signed Delivery and Acceptance Certificate, or (b) the date set forth on the first page of this Lease and Lessee represents and warrants that as of such date, the Motor Vehicle has been delivered to Lessee, Lessee has unconditionally accepted the Motor Vehicle and Lessee agrees that the Motor Vehicle is subject to this Lease. Lessee agrees that if all of the items of Motor Vehicle have not been delivered and accepted hereunder before the Cutoff Date as set forth above, Lessor shall have no obligation to lease the Motor Vehicle to Lessee. The term of this Lease shall begin on the Rent Commencement Date and shall continue for the Initial Term as set forth above unless earlier terminated by Lessor as provided herein. The Rent Commencement Date is the Acceptance Date.

Lessee shall pay as basic rent for the Initial Term of this Lease the amount shown above as Total Basic Rent (subject to adjustment as set forth below). The Total Basic Rent shall be payable without notice or demand of any kind in installments each in the amount of the Basic Rental Payment set forth below (subject to adjustment as set forth below) plus any applicable sales and use tax thereon beginning on the Rent Commencement Date and continuing on the same day of each subsequent month during the Initial Term. If the actual cost of the Motor Vehicle is more or less than the Total Cost as shown, the amount of each installment of rent will be adjusted up or down to provide the same yield to Lessor as would have been obtained if the actual cost had been the same as the Total Cost. The Basic Rental Payment amount and the Total Basic Rent were calculated based on Lessor's cost of funds on the date of this Lease. Notwithstanding anything in this Lease to the contrary, unless the Acceptance Date has already occurred and is set forth above as referenced in clause (b) of the first paragraph of this Section, if Lessor has not received a Delivery and Acceptance Certificate signed by Lessee within fifteen (15) business days of the date of this Lease and Lessor's cost of funds has increased subsequent to the date of this Lease, the Basic Rental Payment amount and the Total Basic Rent will be increased to provide the same yield to Lessor as would have been obtained if Lessor's cost of funds had not increased. The Basic Rental Payment amount and the Total Basic Rent shall be calculated by Lessor taking into account its cost of funds two business days prior to the date that this Lease is funded. Lessee agrees that the funding date shall not occur until Lessor has received all documentation and information required by Lessor, which may include, without limitation, evidence of insurance, invoices, landlord waivers and evidence of no adverse liens or security interests on the Motor Vehicle. In such event Lessee and Lessor shall sign an amendment to this Lease

 

Lease Number          0

Basic Rental Payment If any payment due hereunder is not received by Lessor within ten (10) days of its due date, Lessee agrees to pay a late fee to Lessor equal to the lesser of (i) 5% of the past due amount or (ii) the highest amount allowed by applicable law. Payments thereafter received shall be applied first to delinquent installments and then to current installments.

### THIS AGREEMENT INCLUDES THE TERMS ON THE ATTACHED PAGE(S).

Notice: Lessor reserves the right to withdraw the terms of this Lease and issue a modified Lease without notice to Lessee if Lessor is not in receipt of a fully executed original or facsimile of this document within five (5) business days of the date of this Lease. However, in that event, no such modifications will be binding on Lessee unless and until Lessee executes the modified document containing all such modifications

| Rent Commencement Date:   January 0, 1900 | | | | |
|---|---|---|---|---|
| **SUMMARY OF PAYMENT TERMS** | | | | |
| Initial Term (Months): | | 0 Months | Total Cost: | $0.00 |
| Payment Frequency: | | Monthly | Total Basic Rent: | $0.00 |
| Basic Rental Payment (plus applicable sales and use tax): | | $0.00 | Purchase Option: | $101.00 |
| Number of Installments: | | 1 | Cutoff Date: | January 0, 1900 |
| Down Payment | $              - | Down Payment (With Tax) | $0.00 | TPine Admin Fee: | $1,050.00 |
| **\* TPine Admin fee is included in Total Cost.** | | | | |

Lessor: TPine Leasing Capital, L.P.                    Lessee:                          0

By: _____                    By: _____

Title: _____                    Title: _____ DIRECTOR

**WARNING – BY SIGNING THIS PAPER YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR WHETHER FOR RETURN OF THE GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

3. SECURITY DEPOSIT. Upon execution of this Lease, Lessee shall pay to Lessor the Security Deposit, if any, set forth above. Lessor may apply any security deposit toward any obligation of Lessee, and shall return any unapplied balance to Lessee without interest upon full satisfaction of Lessee's obligations.

4. NO WARRANTIES. Lessee agrees that it has selected each item of Motor Vehicle based upon its own judgment and disclaims any reliance upon any statements or representations made by Lessor. LESSEE ACKNOWLEDGES THAT: LESSOR IS NOT THE MANUFACTURER OF THE MOTOR VEHICLE NOR THE MANUFACTURER'S AGENT NOR A DEALER THEREIN; THE MOTOR VEHICLE IS OF A SIZE, DESIGN, CAPACITY, DESCRIPTION AND MANUFACTURE SELECTED BY LESSEE; LESSEE IS SATISFIED THAT THE MOTOR VEHICLE IS SUITABLE AND FIT FOR ITS PURPOSES; AND LESSOR HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY WITH RESPECT TO THE MOTOR VEHICLE, EXPRESS OR IMPLIED AND LESSOR SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, OR AS TO THE QUALITY, CONDITION OR CAPACITY OF THE MOTOR VEHICLE OR THE MATERIALS IN THE MOTOR VEHICLE OR WORKMANSHIP OF THE MOTOR VEHICLE, LESSOR'S TITLE TO THE MOTOR VEHICLE, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER. LESSOR SHALL NOT BE LIABLE TO LESSEE FOR ANY LOSS, DAMAGE, OR EXPENSE OF ANY KIND OR NATURE CAUSED, DIRECTLY OR INDIRECTLY, BY ANY MOTOR VEHICLE OR THE USE OR MAINTENANCE THEREOF OR THE FAILURE OR OPERATION THEREOF, OR THE REPAIR, SERVICE OR ADJUSTMENT THEREOF, OR BY ANY DELAY OR FAILURE TO PROVIDE ANY SUCH MAINTENANCE, REPAIRS, SERVICE OR ADJUSTMENT, OR BY AN INTERRUPTION OF SERVICE OR LOSS OF USE THEREOF OR FOR ANY LOSS OF BUSINESS HOWSOEVER CAUSED.





Proud Member Of

Lease Number        0

LESSOR SHALL NOT BE LIABLE FOR DAMAGES OF ANY KIND INCLUDING ANY LIABILITY FOR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR THE INABILITY TO USE THE MOTOR VEHICLE. No defect or unfitness of the Motor Vehicle, and no failure on the part of the manufacturer or the shipper of the Motor Vehicle to deliver the Motor Vehicle or any part thereof to Lessee shall relieve Lessee of the obligation to pay rent or any other obligation hereunder. Lessor shall have no obligation in respect of the Motor Vehicle and shall have no obligation to install, erect, test, adjust or service the Motor Vehicle. Lessee shall only look to persons other than Lessor such as the manufacturer, vendor or carrier thereof should any item of Motor Vehicle for any reason and in any way be defective. To the extent permitted by the manufacturer and/or vendor and provided Lessee is not in default under the Lease, Lessor shall make available to Lessee all manufacturer and/or vendor warranties with respect to the Motor Vehicle.

5. TAXES. Lessee shall promptly pay when due and indemnify and hold Lessor harmless (on an after-tax basis) from, all sales, use, property, excise and other taxes and all license and registration fees now or hereafter imposed by any governmental body or agency upon the Motor Vehicle or its use, purchase, ownership, delivery, leasing, possession, storage, operation, maintenance, repair, return or other disposition of the Motor Vehicle, or for titling or registering the Motor Vehicle, or upon the income or other proceeds received with respect to the Motor Vehicle or Lease or the rentals hereunder; provided, however, that Lessee shall not be required to pay taxes on or measured by the net income of Lessor. Upon request by Lessor, Lessee shall permit and assist Lessor in preparing and filing all tax returns relating to taxes for which Lessee is responsible hereunder which Lessee is permitted to file under the laws of the applicable taxing jurisdiction. Upon the expiration or earlier termination of the Lease, Lessee shall pay to Lessor any such taxes accrued or assessed but not yet due and payable.

6. INDEMNITY. Lessee hereby agrees to indemnify and hold Lessor harmless (on an after-tax basis) from and against any and all claims, losses, liabilities (including negligence, tort and strict liability), damages, judgments, obligations, actions, suits and all legal proceedings, and any and all costs and expenses in connection therewith (including attorneys' fees) arising out or in any manner connected with, or resulting directly or indirectly from, the Motor Vehicle, including, without limitation, the manufacture, purchase, lease, financing, selection, ownership, delivery, rejection, non-delivery, transportation, possession, use, storage, operation, condition, maintenance, repair, return or other disposition of the Motor Vehicle or with this Lease, including without limitation, claims for injury to or death of persons and for damage to property, whether arising under the doctrine of strict liability, by operation of law or otherwise, and to give Lessor prompt notice of any such claim or liability.

7. ASSIGNMENT; STATUS OF LESSEE. Lessor may sell or assign any or all of its interest in this Lease or sell or grant a security interest in all or any part of the Motor Vehicle without notice to or the consent of Lessee. Lessee agrees not to assert against any assignee of Lessor any setoff, recoupment, claim counterclaim or defense Lessee may have against Lessor or any person other than such assignee. LESSEE SHALL NOT (a) ASSIGN OR IN ANY WAY TRANSFER OR DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THIS LEASE, (b) ENTER INTO ANY SUBLEASE OF ALL OR ANY PART OF THE MOTOR VEHICLE, (c) sell, transfer or assign any material portion of its assets, (d) allow a controlling interest in Lessee to be sold, transferred or assigned to any person(s) or entity(ies) other than those who hold a controlling interest as of the date hereof whether by merger, sale or otherwise, (e) allow a Blocked Person to have an ownership interest in or control of Lessee, (f) enter into any merger or reorganization in which Lessee is not the surviving entity, or (g) unless Lessee shall have given Lessor no less than thirty (30) days' prior written notice change (i) its name or business address from that set forth above, and, if an individual, its state of residence, (ii) the state under whose laws it is organized as of the date hereof, or (iii) the type of organization under which it exists as of the date hereof. "Blocked Person" means any person or entity that is now or at any time (A) on a list of Specially Designated Nationals issued by the Office Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list, or (B) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (C) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Lessor, to be a person to whom Lessor is not permitted to extend credit or with regard to whom a lessee relationship may result in penalties against Lessor or limitations on a lessor's ability to enforce a transaction.





Lease Number          0

8. OWNERSHIP; LOCATION; USE AND MAINTENANCE. Lessee agrees that the Motor Vehicle is and shall remain personal property of Lessor and shall not permit it to become attached to real property. Lessee shall not permit, suffer or allow any liens, charges or encumbrances to be placed on or levied against the Motor Vehicle and shall at all times keep the Motor Vehicle free and clear of all such liens, charges and encumbrances. Lessee shall not without prior written notice to Lessor, remove or allow any of the Motor Vehicle to be removed from the Motor Vehicle Location specified above, except in the ordinary course of business while equipped with operating GPS tracking. Lessee will use the Motor Vehicle with due care and only for the purpose for which it is intended. Lessee will maintain the Motor Vehicle in good repair, condition and working order and will furnish all parts and services required therefor, all at its expense, ordinary wear and tear excepted. Lessee shall, at its expense, make all modifications and improvements to the Motor Vehicle required by law, and shall not make other modifications or improvements to the Motor Vehicle without the prior written consent of Lessor. All parts, modifications and improvements to the Motor Vehicle shall, when installed or made, immediately become the property of Lessor and part of the Motor Vehicle for all purposes. Lessee shall, at any and all times during business hours, grant Lessor free access to enter upon the premises wherein the Motor Vehicle shall be located or used and permit Lessor to inspect the Motor Vehicle and all applicable maintenance records. The Motor Vehicle shall not be used outside of the United States without Lessor's prior written consent. Hauling and/or carrying Hazardous material is strictly prohibited.

9. LOSS OR DAMAGE. No loss or damage to the Motor Vehicle or any part thereof shall affect any obligation of Lessee under this Lease which shall continue in full force and effect. Lessee shall advise Lessor in writing within five (5) days of any item of Motor Vehicle becoming lost, stolen or damaged and of the circumstances and extent of such damage. No Motor Vehicle shall be declared damaged beyond repair or permanently unfit for use without Lessor's consent and approval. In the event any item of Motor Vehicle shall become lost, stolen, destroyed, damaged beyond repair or rendered permanently unfit for use for any reason, or in the event of condemnation or seizure of any item of Motor Vehicle, Lessee shall promptly, within ten (10) days after demand by Lessor, pay Lessor an amount equal to Lessor's Loss as defined in paragraph 14 with respect to such item at the time of payment based on the proportion that the original cost of such item bears to the Total Cost of all items of Motor Vehicle. Upon payment of such amount to Lessor, such item shall become the property of Lessee, Lessor will transfer to Lessee, without recourse or warranty, all of Lessor's right, title and interest therein, the rent with respect to such item shall terminate, and the Basic Rental Payments on the remaining items shall be reduced accordingly. Lessee shall pay any sales and use taxes due on such transfer. Any insurance or condemnation proceeds received shall be credited to Lessee's obligation under this paragraph and Lessee shall be entitled to any surplus. Whenever the Motor Vehicle is damaged and such damage can be repaired, Lessee shall, at its expense, promptly effect such repairs as Lessor shall deem necessary for compliance with paragraph 8 above. Proceeds of insurance shall be paid to Lessor with respect to such reparable damage to the Motor Vehicle and shall, at the election of Lessor, be applied either to the repair of the Motor Vehicle by payment by Lessor directly to the party completing the repairs, or to the reimbursement of Lessee for the cost of such repairs; provided, however, that Lessor shall have no obligation to make such payment or any part thereof until receipt of such evidence as Lessor shall deem satisfactory that such repairs have been completed and further provided that Lessor may apply such proceeds to the payment of any rent or other sum due or to become due hereunder if at the time such proceeds are received by Lessor there shall have occurred any Event of Default or any event which with lapse of time or notice, or both, would become an Event of Default.

10. INSURANCE. Lessee shall obtain and maintain on or with respect to the Motor Vehicle at its own expense (a) liability insurance (including bodily injury and property damage) with a minimum $1 million combined single limit per occurrence and (b) physical damage insurance insuring against loss or damage to the Motor Vehicle in an amount not less than the full replacement cost of the Motor Vehicle. Lessee shall furnish Lessor with a certificate of insurance evidencing the issuance of a policy or policies to Lessee in at least the minimum amounts required herein naming Lessor as an additional insured thereunder for the liability coverage and as (i) loss payee for the property damage coverage, with (ii) lender loss payee endorsements for the property damage coverage. Each such policy shall be in such form and with such insurers as may be satisfactory to Lessor, and shall contain a clause specifying that no action or misrepresentation by Lessee shall invalidate such policy and a clause requiring the insurer to give to Lessor at least thirty (30) days' prior written notice of (i) the cancellation or non-renewal of such policy or (ii) any amendment to the terms of such policy if such amendment would cause the policy no longer to conform to the policy requirements stated in this paragraph; and ten (10) days prior notice of cancellation for non-payment of premium. Lessee shall deliver, annually and at any time that there is a change in insurance carrier, to Lessor evidence satisfactory to Lessor of the required insurance coverage. Lessee hereby assigns to Lessor the proceeds of





Proud Member Of

Lease Number          0

all such insurance and directs any insurer to make payments directly to Lessor. Lessor shall be under no duty to ascertain the existence of or to examine any such policy or to advise Lessee in the event any such policy shall not comply with the requirements hereof.

11. PURCHASE OPTION. Provided that the Lease has not been terminated early and no Event of Default has occurred and is continuing, then Lessee may upon at least 60 days but not more than 120 days written notice and upon delivery on or before the expiration of the initial term of the Lease of a certified or cashier's check for the purchase price, purchase all but not less than all of the Motor Vehicle at the expiration of the initial term of the Lease for a purchase price equal to the Purchase Option on the first page of this lease and an option fee of $495.00 plus applicable sales tax. Upon Lessor's receipt of the purchase price for the Motor Vehicle, the Motor Vehicle will be deemed transferred to Lessee at its then location. Any purchase of the Motor Vehicle pursuant to this paragraph shall be  "AS IS-WHERE IS", with all faults and without any warranty whatsoever. Lessor makes no representation with respect to income tax consequences of the purchase option contained herein, and Lessor may in its sole discretion treat the Lease as a sale regardless of how the Lease is treated by the Lessee.


12. ADDITIONAL ACTION. Lessee will promptly execute and deliver to Lessor such further documents, take such further action and provide such information as Lessor may request in order to carry out more effectively the intent and purpose of this Lease, and/or comply with laws or regulations applicable to Lessor, Lessee, and/or the transaction evidenced by this Lease, including information identifying the owners of Lessee and its affiliates and their respective ownership interests. Lessor and any assignee of Lessor is authorized to file one or more Uniform Commercial Code financing statements without the signature of Lessee. Lessee hereby grants to Lessor a power of attorney in Lessee's name, to apply for a certificate of title for any item of Motor Vehicle that is required to be titled under the laws of any jurisdiction where the Motor Vehicle is or may be used and/or to transfer title thereto upon the exercise by Lessor of its remedies upon an Event of Default by Lessee under this Lease. Lessee will pay (or reimburse Lessor for) the reasonable costs and expenses related to (a) filing any financing, continuation or termination statements, (b) any title and lien searches with respect to this Lease and the Motor Vehicle, (c) any documentary stamp taxes relating to the Lease, and (d) procuring certified charter documents and good standing certificates of Lessee and any guarantor of Lessee's obligations hereunder. Lessee will do whatever may be necessary to have a statement of the interest of Lessor and any assignee of Lessor in the Motor Vehicle noted on any certificate of title relating to the Motor Vehicle and will deliver said certificate to Lessor. If Lessee fails to perform or comply with any of its agreements, Lessor may perform or comply with such agreements in its own name or in Lessee's name as attorney-in-fact and the amount of any payments and expenses of Lessor incurred in connection with such performance or compliance, together with interest thereon at the rate provided below, shall be deemed rent payable by Lessee upon demand.


13. DEFAULT. Each of the following events shall constitute an "Event of Default" hereunder:
(a) Lessee shall fail to pay within ten (10) days of when due any installment of interim rent, basic rent or any other amount due hereunder; (b) any certificate, statement, representation, warranty or financial or credit information heretofore or hereafter made or furnished by or on behalf of Lessee or any guarantor of any of Lessee's obligations hereunder (a "Guarantor") proves to have been false or misleading in any material respect or omitted any material fact, contingent or unliquidated liability or claim against Lessee or any such Guarantor; (c) Lessee shall fail to observe or perform any other agreement to be observed or performed by Lessee hereunder and the continuance thereof for ten (10) days following the earlier of (i) written notice thereof by Lessor to Lessee or (ii) Lessee's first knowledge thereof, provided however that this provision shall not extend the date of default for breach of material obligations under subsection (g); (d) Lessee or any Guarantor or any partner of Lessee if Lessee is a partnership shall cease doing business as a going concern, make an assignment for the benefit of creditors, become insolvent, or engage in any dissolution or liquidation proceedings; (e) Lessee or any Guarantor or any partner of Lessee if Lessee is a partnership shall voluntarily file, or have filed against it involuntarily, a petition for liquidation, reorganization, adjustment of debt, or similar relief under the federal Bankruptcy Code or any other present or future federal or state bankruptcy or insolvency law, or a trustee, receiver, or liquidator substantial part of its assets; (f) any individual Lessee, Guarantor , or partner of Lessee if Lessee is a partnership shall die; (g) Lessee or any Guarantor shall be in breach of or in default in the payment or performance of any material obligation under any insurance contract, credit agreement, conditional sales contract, lease, guaranty, or other contract with Lessor, an affiliate of Lessor or any







Lease Number          0

other person or entity, howsoever arising; (h) Lessee, or any Guarantor shall suffer a material adverse change in its financial condition from the date hereof, and as a result thereof Lessor deems itself or any of the Motor Vehicle to be insecure; (i) any Guarantor fails to pay or perform any obligation owing to Lessor, or breaches or fails to observe or perform any term, condition, covenant, representation or warranty contained in any agreement made by such Guarantor in favor of Lessor and such failure or breach continues beyond the applicable grace or cure period set forth in such agreement, if any; or (j) Lessee, any Guarantor, or any principal owner, senior officer or director of Lessee or of any Guarantor is convicted of a felony.

14. REMEDIES. Lessor and Lessee agree that Lessor's damages suffered by reason of an Event of Default are uncertain and not capable of exact measurement at the time this Lease is executed because the value of the Motor Vehicle at the expiration of this Lease is uncertain, and therefore they agree that for purposes of this paragraph 14 "Lessor's Loss" as of any date shall be the sum of the following: (1) the amount of all rent and other amounts payable by Lessee hereunder due but unpaid as of such date plus (2) the amount of all unpaid rent for the balance of the term of this Lease not yet due as of such date discounted from the respective dates installment payments would be due at the Discount Rate as defined below plus (3) the then present value of the Purchase Option as specified on the first page of this Lease. "Discount Rate" means (i) the rate set forth for the United States Treasury Bond or Note having the closest term to (but not longer than) the original term of this Lease, two business days prior to the Rent Commencement Date, (ii) the rate set forth for the United States Treasury Bond or Note having the closest term to (but not longer than) the remaining term of this Lease, two business days prior to the date of calculation of Lessor's Loss, or (iii) 3%, whichever is lowest. If a rate referred to in the preceding clauses "(i)" or "(ii)", such rate shall be taken from a reputable source selected by Lessor. Upon the occurrence of an Event of Default and at any time thereafter, Lessor may exercise any one or more of the remedies listed below as Lessor in its sole discretion may lawfully elect; provided, however, that upon the occurrence of an Event of Default specified in paragraph 13(e), an amount equal to Lessor's Loss as of the date of such occurrence shall automatically become and be immediately due and payable without notice or demand of any kind. The exercise of any one remedy shall not be deemed an election of such remedy or preclude the exercise of any other remedy, and such remedies may be exercised concurrently or separately but only to the extent necessary to permit Lessor to recover amounts for which Lessee is liable hereunder.

(a) Lessor may, by written notice, to Lessee, terminate this Lease as to any portion of the Motor Vehicle subject to this agreement and declare an amount equal to Lessor's Loss as of the date of such notice to be immediately due and payable, as liquidated damages and not as a penalty, and the same shall thereupon be and become immediately due and payable without further notice or demand, and all rights of Lessee to use the Motor Vehicle shall terminate but Lessee shall be and remain liable as provided in this paragraph 14. Lessee shall at its expense promptly deliver the Motor Vehicle to Lessor at a location or locations within the continental United States designated by Lessor. Lessor may also enter upon the premises where the Motor Vehicle is located and take immediate possession of and remove the same with or without instituting legal proceedings.

(b) Lessor may proceed by appropriate court action to enforce performance by Lessee of the applicable covenants of this Lease or to recover, for breach of this Lease, Lessor's Loss as of the date Lessor's Loss is declared due and payable hereunder; provided, however, that upon recovery of Lessor's Loss from Lessee in any such action without having to repossess and dispose of the Motor Vehicle, Lessor shall transfer the Motor Vehicle to Lessee at its then location upon payment of any additional amount due under clauses (d), (e) and (f) below.

(c) Lessee hereby authorizes any attorney at law to appear in any court of record of the State of Ohio or any other State in the United States at any time after this Lease becomes due, whether by acceleration or otherwise, and to waive the issuing and service of process and confess a judgment in favor of the lessor, or lessor's assignee, against lessee and any co-signor, or either or any one or them, for the amount of the unpaid balance of Lessor's Loss plus any amounts recoverable under clauses (e) and (f) of this paragraph 14 then appearing due upon this Lease Agreement, together with costs of suit and to release all errors and waive all right to appeal.





Proud Member Of

Lease Number          0

(d) In the event Lessor repossesses the Motor Vehicle, Lessor shall either retain the Motor Vehicle in full satisfaction of Lessee's obligation hereunder or sell or lease each item of Motor Vehicle in such manner and upon such terms as Lessor may in its sole discretion determine. The proceeds of any such sale or lease shall be applied to reimburse Lessor for Lessor's Loss and any additional amount due under clauses (d), (e) and (f) below. Lessor shall be entitled to any surplus and Lessee shall remain liable for any deficiency.

(e) Lessor may recover interest on the unpaid balance of Lessor's Loss plus any amounts recoverable under clauses (e)and(f) of this paragraph 14 from the date it becomes payable until fully paid at the rate of the lesser of 12% per annum or the highest rate permitted by law.

(f) In addition to any other recovery permitted here under or under applicable law, Lessor may recover from Lessee an amount that will fully compensate Lessor for any loss of or damage to Lessor's residual interest in the Motor Vehicle.

(g) Lessor may exercise any other right or remedy available to it by law or by agreement, and may in any event recover legal fees and other costs and expenses incurred by reason of an Event of Default or the exercise of any remedy hereunder, including expenses of repossession, repair, storage, transportation, and disposition of the Motor Vehicle. Any payment received by Lessor may be applied to unpaid obligations as Lessor in its sole discretion determines. If this Lease is deemed at any time to be a lease intended as security, Lessee grants Lessor a security interest in the Motor Vehicle to secure its obligations under this Lease and all other indebtedness at any time owing by Lessee to Lessor. Lessee agrees that upon the occurrence of an Event of Default, in addition to all of the other rights and remedies available to Lessor hereunder, Lessor shall have all of the rights and remedies of a secured party under the Uniform Commercial Code. No express or implied waiver by Lessor of any breach of Lessee's obligations hereunder shall constitute a waiver of any other breach of Lessee's obligations hereunder.

15. NET LEASE AND UNCONDITIONAL OBLIGATION. This Lease is a completely net lease and Lessee's obligation to pay rent and amounts payable by Lessee hereunder is unconditional and irrevocable and shall be paid without any abatement, reduction, setoff or defense of any kind. This Lease is a finance lease defined by UCC section 2A-103(1)(g). This Lease cannot be canceled, modified, repudiated prepaid or terminated, nor are its obligations subject to excuse or substitution, except as expressly provided herein.

16. NON-WAIVER. No course of dealing between Lessor and Lessee or any delay or omission on the part of Lessor in exercising any rights hereunder shall operate as a waiver of any rights of Lessor. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No waiver or consent shall be binding upon Lessor unless it is in writing and signed by Lessor. To the extent permitted by applicable law, Lessee hereby waives the benefit and advantage of, and covenants not to assert against Lessor, any valuation, inquisition, stay, appraisement, extension or redemption laws now existing or which may hereafter exist which, but for this provision, might be applicable to any sale or re-leasing made under the judgment, order or decree of any court or under the powers of sale and re-leasing conferred by this Lease or otherwise. To the extent permitted by applicable law, Lessee hereby waives any and all rights and remedies conferred upon a Lessee by Article 2A-508 through 2A-522 of the Uniform Commercial Code, including but not limited to Lessee's rights to: (i) cancel this Lease; (ii) repudiate this Lease; (iii) reject the Motor Vehicle; (iv) revoke acceptance of the Motor Vehicle; (v) recover damages from Lessor for any breaches of warranty or for any other reason; (vi) claim a security interest in the Motor Vehicle in Lessee's possession or control for any reason;  (vii) deduct all or any part of any claimed damages resulting from Lessor's default, if any, under this Lease; (viii) accept partial delivery of the Motor Vehicle; (ix) "cover" by making any purchase or lease of or contract to purchase or lease Motor Vehicle in substitution of Motor Vehicle identified to this Lease;

(x) recover any general, special, incidental, or consequential damages, for any reason whatsoever; and (xi) specific performance, replevin, detinue, sequestration, claim, delivery or the like for any Motor Vehicle identified to this Lease.

17. REPRESENTATIONS AND AGREEMENTS. Lessee hereby represents and agrees that (a) effective on the date on which Lessee executes this Lease: (i) if Lessee is a partnership, corporation, limited liability company or other legal entity, the execution and





delivery of this Lease and the performance of Lessee's obligations hereunder have been duly authorized by all necessary action on the part of the Lessee; (ii) the person signing the Lease on behalf of Lessee is duly authorized; (iii) all information provided by Lessee to Lessor in connection with this Lease is true and correct; and (iv) this Lease constitutes a legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms; (b) the Motor Vehicle will be used primarily for business purposes as opposed to personal, family or household purposes; (c) Lessee shall comply with all federal, state and local laws, regulations and rules relating to the ownership or operation of Lessee's business, the Motor Vehicle and/or its use; (d) Lessee authorizes Lessor to pay the Total Cost as set forth on the first page of this Lease directly to the seller of the Motor Vehicle to the extent of the unpaid balance of the purchase price; and (e) Lessee shall (i) maintain a system of accounts established and administered in accordance with generally accepted accounting principles and practices consistently applied; (ii) within forty-five (45) days after the end of each fiscal quarter other than the final fiscal quarter of each fiscal year, deliver to Lessor a balance sheet and statement of income as at the end of such quarter, each setting forth in comparative form the corresponding figures for the comparable period in the preceding fiscal year and, within one hundred and twenty (120) days after the end of each fiscal year, deliver to Lessor a balance sheet as at the end of such year and statements of income and cash flows for such year, with accompanying notes to financial statements, each setting forth in comparative form the corresponding figures for the preceding year, in each case prepared in accordance with generally accepted accounting principles and practices consistently applied and certified by Lessee's chief financial officer as fairly presenting the financial position and results of operations of Lessee, and, in the case of year-end financial statements, certified by an independent accounting firm acceptable to Lessor; and (iii) with reasonable promptness, furnish Lessor with such other information, financial or otherwise, relating to Lessee or the Motor Vehicle as Lessor shall reasonably request.

18. MISCELLANEOUS. This Lease constitutes the entire agreement between Lessor and Lessee and may be modified only by a written instrument signed by Lessor and Lessee. Any provision of this Lease that is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions of this Lease, and any such unenforceability in any jurisdiction shall not render unenforceable such provision in any other jurisdiction. Notwithstanding anything to the contrary contained herein, if any rate of interest, late fee or any other charges or fees due hereunder are determined by a court of competent jurisdiction to be usurious, then said interest rate, fees and/or charges shall be reduced to the maximum amount permissible under applicable law and any such excess amounts shall be applied towards the Lessee's obligations hereunder. Paragraph headings are for convenience only, are not part of this Lease and shall not be deemed to affect the meaning or construction of any of the provisions hereof. In the event there is more than one Lessee named in his Lease, the obligations of each shall be joint and several. Lessee's obligations under paragraphs 5, 6, 11 and 14 shall survive termination or expiration of this Lease. Any written notice hereunder to Lessee or Lessor shall be deemed to have been given when delivered personally or deposited with a recognized overnight courier service or in the United States mails, postage prepaid, addressed to recipient at its address set forth on the first page of this Lease or at such other address as may be last known to the sender. Lessor may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this Lease (a "Counterpart") as the binding and effective record of this Lease whether or not an ink signed copy hereof is also received by Lessor from Lessee, provided, however, that if Lessor accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing above by Lessor shall constitute the record hereof. Lessee represents to Lessor that the signature that appears on the Counterpart that is transmitted by Lessee to Lessor in any manner described above is intended by Lessee to authenticate the Counterpart notwithstanding that such signature is electronic, facsimile or a reproduction and Lessee further agrees that such Counterpart received by Lessor, shall, when acknowledged in writing by Lessor, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against Lessee.

If Lessor accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing above by Lessor may be marked "Original" and to the extent that this Lease constitutes chattel paper, perfection of a security interest by possession may only be accomplished by possession of the Counterpart that bears Lessor's ink signed acknowledgement and is marked "Original." This Lease shall in all respects be governed by, and construed in accordance with, the substantive laws of the state of Ohio. The parties consent to the jurisdiction of the Court of Common Pleas, Lucas County, Ohio. TIME IS OF THE ESSENCE WITH





Lease Number        0

RESPECT TO THE OBLIGATIONS OF LESSEE UNDER THIS LEASE. LESSEE HEREBY WAIVES ANY RIGHT TO A JURY TRIAL WITH RESPECT TO ANY MATTER UNDER OR IN CONNECTION WITH THIS LEASE.

19.  Vehicle Service Agreement as per Schedule "B".

**Verification of Information**

**Federal Tax ID #**     0

**Email Address:**     0

**Documentation Contact Name:**

**Principal Place of Business Address:**

**Street:**     0

**City:**     0

**State:**     0

**Zip:**     0

**The address stated above is correct OR change the address as stated below.**

**Street:**

**City:**

**State:**

**Zip:**

**Billing Address:**

**Street:**     0

**City:**     0

**State:**     0

**Zip:**     0





Lease Number          0

The motor vehicle will be located at the Motor Vehicle Commerical Parking/Garage Location stated below OR at the address shown on the attached Schedule Indicate County the motor vehicle is located in; or the motor vehicle will be located at:

**Street:**  0

**City:**  0

**State:**  0

**Zip:**  0

*******If multiple locations, attach a complete list of motor vehicles by City, State, and County indicating where each motor vehicle is located*******

The vehicle(s) requires registration and/or permitting only (i.e. "off-road", "specialty vehicle", "off-highway", etc.) and is exempt from titling. The Certificate of Origin or existing title is attached or will be forwarded to TPine Leasing Capital, L.P. immediately upon receipt.

**Sales/Use Tax: (check one)**

Subject to sales and use tax. (Tax will be charged based on the type of motor vehicle and on the state in which the motor vehicle is located.); or

<span style="color:red">Exempt from sales and use tax, for the following reason:
(YOU MUST REMIT A VALID EXEMPTION CERTIFICATE PRIOR TO FUNDING).</span>

Personal Property Tax: If the motor vehicle is located in a state or locality that requires reporting of the motor vehicle on a personal property tax return, please include the motor vehicle with other property you own.

Heavy Vehicle Use Tax: Some vehicles are liable for Heavy Vehicle Use Tax, filed on Federal Form 2290. TPine Leasing Capital, L.P. does not file this return. If you determine the vehicle(s) is liable for this tax, you should include it on your own Form 2290. Failure to report a taxable vehicle may prevent you from obtaining licenses or tabs.

**Notice: To help the government fight the funding of terrorism and the money laundering activities, U.S. Federal law requires financial institutions to obtain, verify and record information that identifies each person (individuals or businesses) who opens an account.**
**What this means for you: When you open an account or add any additional service, we will ask you for your name, address and taxpayer identification number that will allow us to identify you. We may also ask to see other identifying documents.**





Proud Member Of

Lease Number          0

**Authorization for Automatic Payment Plan**

TPine Leasing Capital, L.P. | 1125 E. Alexis Road | Toledo, Ohio 43612

By completing and returning this form, TPine Leasing Capital, L.P. ("Creditor") is authorized to charge all regularly scheduled payments and all other obligations due and owing ("Payment") to the account referenced below (the "Debit Account"). Payments will be automatically drafted to coincide with the contract due date as indicated on the summary of lease terms on the lease agreement. Proof of payment may be verified through the bank account or monthly statement with the bank described below.

The authorization provided to charge the Debit Account will be effective for all current and future contracts with Creditor and will remain in effect until Creditor receives notice in writing to terminate the authorization and has reasonable opportunity to act on it.

Please make regular payments until your monthly invoice indicates that the Automatic Payment Plan is in effect.

("Customer") hereby authorizes Creditor to initiate electronic debit entries to the Debit Account. Any Debit Account with a fraud filter will require the company ID of the Creditor to accept an electronic debit. The Creditor's company ID for this authorization is (Pridegro). This authorization will remain in creditor receives notice in writing from the Customer at the address set forth above to cancel it in such time as to afford the Creditor a reasonable opportunity to act on it. The Customer may stop payment of any entry by notifying Creditor three days before the Debit Account is charged. Funds transfers to or from the Debit Account will be governed by the rules of any funds transfer system through which the transfers are made, as amended from time to time, including, without limitation, the National Automated Clearing House Association and any regional association (each, an "ACH"). The Customer agrees that electronic debit entries that are authorized herein comply with all applicable laws, rules and regulations.

Customer Name:     0 _____

Customer Address:    0 _____

City:     0 _____

State:     0 _____          ZIP          0 _____

Phone:    0 _____

Authorized Signature:     _____

    Title:          DIRECTOR _____

    Date:          1/0/1900 _____



Proud Member Of


Lease Number        0

Bank Name: _____

City: _____

State: _____

Checking Account Number: _____

Bank Routing Number: _____

**\*\*\*\*\*\*\*\*\*\*\*\*PLEASE ATTACH A VOIDED CHECK\*\*\*\*\*\*\*\*\*\*\*\***

**\*No temporary checks accepted, must be in the name of the Lessee or PG if Lessee is a company.**

| FOR OFFICE USE ONLY | | |
|---|---|---|
| Payment Due Date(s):        0 | Lease No. | 0 |
| Comments: | | |

Continuing Guaranty

 

Lease Number      0

## Continuing Guaranty

TPine Leasing Capital, L.P. | 1125 E. Alexis Road | Toledo, Ohio 43612

1. GUARANTY; DEFINITIONS. In consideration of any credit or other financial accommodation now or hereafter extended or made to                                                     (Lessee), or any of them, by TPine Leasing Capital, L.P. and affiliates ("Lessor"), and for other valuable consideration, the undersigned () ("Guarantor"), unconditionally guarantees to Lessor the full and prompt payment and performance when due of any and all Indebtedness of the Lessee to Lessor. The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Lessee, or any of them there to fore, now or hereafter made, incurred or created, whether direct or indirect, voluntary or involuntary and however arising, whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any loan agreement, note, lease, security agreement, swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and all modifications, extensions and renewals thereof, and whether Lessee may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter become unenforceable. This Guaranty is a guaranty of payment and not collection.

2. CONTINUING LIABILITY; SUCCESSIVE TRANSACTIONS; REVOCATION;OBLIGATION UNDER OTHER GUARANTIES. This is a continuing guaranty and all rights, powers and remedies hereunder shall apply to all past, present and future Indebtedness of the Lessee to Lessor, including that arising under successive transactions which shall either continue the Indebtedness, increase or decrease it, or from time to time create new Indebtedness after all or any prior Indebtedness has been satisfied, and notwithstanding the death, incapacity, dissolution, liquidation or bankruptcy of the Lessee or Guarantor or any other event or proceeding affecting the Lessee or Guarantor. This Guaranty shall not apply to any new Indebtedness created more than fifteen (15) days after actual receipt by Lessor of written notice of its termination as to such new Indebtedness; provided however, that loans, advances, leases or other financial accommodations made by Lessor to, for or with the Lessee after termination under commitments existing prior to receipt by Lessor of such termination, and extensions, renewals or modifications, of any kind, of Indebtedness incurred by the Lessee or committed by Lessor prior to receipt by Lessor of such termination, shall not be considered new Indebtedness. Any such notice must be sent to Lessor by registered U.S. mail, postage prepaid, addressed to its office at the top of this page, or at such other address as Lessor shall from time to time designate. Termination of this Guaranty by any single Guarantor will not affect the existing and continuing obligations of any other Guarantor hereunder. The obligations of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guaranties of any liabilities or obligations of the Lessee or any other persons heretofore or hereafter given to Lessor unless said other guaranties are expressly modified or revoked in writing; and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guaranties.

3. OBLIGATIONS JOINT AND SEVERAL; SEPARATE ACTIONS; WAIVER OF STATUTE OF LIMITATIONS; REINSTATEMENT OF LIABILITY. The obligations hereunder are joint and several and independent of the obligations of Lessee, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against the Lessee or any other person, or whether the Lessee or any other person is joined in any such action or actions. Guarantor acknowledges that this Guaranty is absolute and unconditional, there are no conditions

**Continuing Guaranty**



Proud Member Of



Lease Number     0

precedent to the effectiveness of this Guaranty, and this Guaranty is in full force and effect and is binding on Guarantor as of the date written below, regardless of whether Lessor obtains collateral or any guaranties from others or takes any other action contemplated by Guarantor. Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof. The liability of Guarantor hereunder shall be reinstated and revived and the rights of Lessor shall continue if and to the extent for any reason any amount at any time paid on account of any Indebtedness guaranteed hereby is rescinded, avoided or must otherwise be restored by Lessor, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid. The determination as to whether any amount so paid must be rescinded or restored shall be made by Lessor in its sole discretion; provided however, that if Lessor chooses to contest any such matter at the request of Guarantor, Guarantor agrees to indemnify and hold Lessor harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Lessor in connection therewith, including without limitation, in any litigation  with respect thereto.

4. AUTHORIZATIONS TO LESSOR. Guarantor authorizes Lessor either before or after revocation hereof, without notice to or demand on Guarantor, and without affecting Guarantor's liability hereunder, from time to time to: (a) alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; (b) exchange, enforce, waive, subordinate or release any security for the payment of this Guaranty or the Indebtedness or any portion thereof;

(c) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage, or deed of trust, as Lessor in its discretion may determine; (d) release or substitute any one or more of the endorsers or any other guarantors of the Indebtedness, or any portion thereof, or any other party thereto; and (e) apply payments received by Lessor from the Lessee to any Indebtedness of the Lessee to Lessor, in such order as Lessor shall determine in its sole discretion, whether or not such Indebtedness is covered by this Guaranty, and Guarantor hereby waives any provision of law regarding application of payments which specifies otherwise. Lessor may without notice assign this Guaranty in whole or in part.

THIS AGREEMENT INCLUDES THE TERMS ON THE ATTACHED PAGE(S).

| Date of Agreement: | January 0, 1900 | Date of Agreement: | |
|---|---|---|---|
| Guarantor: | 0 | Guarantor: | |
| Date of Birth: | 1/0/1900 | Date of Birth: | |
| Social Security Number: | 0 | Social Security Number: | |
| Driver's License Number: | 0 | Driver's License Number:: | |

**Continuing Guaranty**





Lease Number        0

| | |
|---|---|
| Date of Agreement: _____ | Date of Agreement: _____ |
| Guarantor: _____ | Guarantor: _____ |
| Date of Birth: _____ | Date of Birth: _____ |
| Social Security Number: _____ | Social Security Number: _____ |
| Driver's License Number: _____0_____ | Driver's License Number:: _____0_____ |

Home Street Address (PO Box Not Allowed):
0

City: 0

State: 0

Phone: 0

Home Street Address (PO Box Not Allowed):

City:

State:

Phone:

Home Street Address (PO Box Not Allowed):

City:

State:

Phone:

Home Street Address (PO Box Not Allowed):

City:

State:

Phone:

5. REPRESENTATIONS, WARRANTIES AND COVENANTS. (a) Guarantor represents and warrants to Lessor that: (i) this Guaranty is executed at Debtor's request; (ii) Guarantor shall not, without Creditor's prior written consent, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or a substantial or material part of Guarantor's assets other than in the ordinary course of Guarantor's business; (iii) Lessor has made no representation to Guarantor as to the creditworthiness of the Lessee and (iv) Guarantor is not and has never been a Blocked Person (defined below) nor does Guarantor have any ownership interest in any Blocked Person. (b) Guarantor covenants with Lessor that: (i) from time to time as may be requested by Lessor, Guarantor will deliver to Lessor with reasonable promptness, (x) personal financial statements (y) state and federal tax returns and (z) such other financial information as Lessor shall reasonably request; (ii) Guarantor will not change his or her name or address without giving Lessor at least 30 days prior written notice thereof; and (iii) for so long as any of the Indebtedness remains outstanding, Guarantor shall not become a Blocked Person or own or hold, directly or indirectly, any ownership interest in any Blocked Person. "Blocked Person" means any person or entity that is



**Continuing Guaranty**



Lease Number    0

now or at any time (A) on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list, or (B) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (C) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Lessor, to be a person to whom Lessor is not permitted to extend credit or with regard to whom a guarantor relationship may result in penalties against Lessor or limitations on a Creditor's ability to enforce a transaction.

6. GUARANTOR'S WAIVERS.

(a) Guarantor waives any right to require Lessor to: (i) make demand upon, assert claims against or proceed against the Lessee or any other person; (ii) marshal assets or proceed against or exhaust any security held from the Lessee or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from the Lessee or any other person; (iv) take any other action or pursue any other remedy in Creditor's power; or (v) make any presentment or demand for performance, or give any notice of extensions, modifications or renewals of Indebtedness, any new transactions between Lessee and Lessor and/or any other Guarantor, presentment, nonperformance, protest, notice of default,, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Lessor as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness.

(b) Guarantor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of the Lessee or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of the Lessee or any other person; (iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of the Lessee which is a corporation, partnership or other type of entity, or any defect in the formation of any such Lessee; (iv) the application by the Lessee of the proceeds of any Indebtedness for purposes other than the purposes represented by Lessee to, or intended or understood by, Lessor or Guarantor; (v) any act or omission by Lessor which directly or indirectly results in or aids the discharge of the Lessee or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Lessor against the Lessee; (vi) any impairment of the value of any interest in any security for the Indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) or any requirement that Lessor give any notice of acceptance of this Guaranty. Until all Indebtedness shall have been paid in full, Guarantor shall have no right of subrogation, and Guarantor waives any right to enforce any remedy which Lessor now has or may hereafter have against the Lessee or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Lessor. Guarantor further waives all rights and defenses  Guarantor may have arising out of (A) any election of remedies by Lessor, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against the Lessee for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers or remedies of the Lessee in connection with any anti- deficiency laws or any other laws limiting, qualifying or discharging Debtor's Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property

**Continuing Guaranty**





Lease Number     0

security for any portion of the Indebtedness.

7. REMEDIES; NO WAIVER. All rights, powers and remedies of Lessor hereunder are cumulative. No delay, failure or discontinuance of Lessor in exercising any right, power or remedy hereunder shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver, permit, consent or approval of any kind by Lessor of any breach of this Guaranty, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

8. COSTS, EXPENSES AND ATTORNEYS' FEES. Guarantor shall pay to Lessor immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by Lessor in connection with the enforcement of any of Creditor's rights, powers or remedies and/or the collection of any amounts which become due to Lessor under this Guaranty or to enforce or collect any of the Indebtedness, and the prosecution or defense of any action in any way related to this Guaranty.

9. SUCCESSORS; ASSIGNMENT. This Guaranty shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Guarantor may not assign or transfer any of its interests or rights hereunder without Creditor's prior written consent. Guarantor acknowledges that Lessor has the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, any Indebtedness of Debtor to Lessor and any obligations with respect thereto, including this Guaranty. In connection therewith, Lessor may disclose all documents and information which Lessor now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Lessee, Guarantor or otherwise. Guarantor further agrees that Lessor may disclose such documents and information to Lessee.

10. COMMUNITY AND OTHER PROPERTY. In addition to the rights of Lessor under any applicable community property laws, Guarantor who is a Married Person and who has an interest in marital or community property under applicable law acknowledges and agrees that his/her obligation as a Guarantor is incurred in the interest of and to benefit the marital community (or domestic partnership, if applicable), and expressly agrees that recourse may be had against his or her separate property and his or her rights in community property and community assets for all of his or her obligations to Lessor, in addition to any other property that may be subject to rights of Lessor. Guarantor also agrees not to, without Creditor's prior written consent, enter into any community property agreement which alters the separate or community property character of any of such party's property. For the purpose of this provision, "Married Person" means a person in a spousal relationship and shall include parties to a duly registered and/or legally recognized same-sex civil union, domestic partnership, and other terms, whether or not gender specific in a spousal relationship, that denote spousal relationship, as those terms are used throughout the laws, codes and regulations of states and/or jurisdictions that recognize legally married same-sex couples, civil unions and/or domestic partnerships, and any references herein to a married person or marital status shall be deemed to also include the applicable corresponding term, or other reference relating to a party to a civil union or domestic partnership.

11. MISCELLANEOUS. This Guaranty may be amended or modified only in writing signed by Lessor and Guarantor. In all cases where there is more than one Lessee named herein, the word "Lessee" shall mean all or any one or



**Continuing Guaranty**



Lease Number    0

more of them as the context requires. If any waiver or other provision of this Guaranty shall be held to be prohibited by or invalid under applicable public policy or law, such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or other provision or any remaining provisions of this Guaranty. This Guaranty shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to its conflicts of laws principles. Guarantor will promptly execute and deliver to Lessor such further documents, and take such further action and provide such information as Lessor may request in order to carry out more effectively the intent and purpose of this Guaranty, and or comply with laws or regulations applicable to Guarantor, Lessor, and/or the transaction evidenced by this Guaranty, including information identifying the owners of Guarantor and its affiliates and their respective ownership interests. Lessor may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this Guaranty (a "Counterpart") as the binding and effective record of this Guaranty whether or not an ink signed copy hereof is also received by Lessor from the undersigned, provided, however, that if Lessor accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing by Lessor shall constitute the record hereof. The Guarantor represents to Lessor that the signature that appears on the Counterpart that is transmitted by Guarantor to Lessor in any manner described above is intended by Guarantor to authenticate the Counterpart notwithstanding that such signature is electronic, facsimile or a reproduction and Guarantor further agrees that such Counterpart received by Lessor, shall, when acknowledged in writing by Lessor, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against the Guarantor. If Lessor accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing by Lessor may be marked "Original" and perfection of a security interest by possession may only be accomplished by possession of the Counterpart that bears Creditor's ink signed acknowledgement and is marked "Original."

12. WARRANT OF ATTORNEY. Guarantors hereof hereby authorize any attorney at law to appear in any court of record of the State of Ohio or any other State in the United States at any time after this guaranty becomes due, whether by acceleration or otherwise, and to waive the issuing and service of process and confess a judgment in favor of the legal holder hereof against the maker(s) and endorser(s), or either or any one or more of them, for the amount of principal and interest then appearing due upon this note, together with costs of suit and to release all errors and waive all right to appeal. The guarantors hereby acknowledge this debt arises from non-consumer lending and waive presentment, demand, notice of dishonor, protest and notice of nonpayment and protest. Each of the undersigned has executed this instrument in the capacity of obligor, regardless of the location of his signature.

**WARNING -- BY SIGNING THIS PAPER YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE LESSOR WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

**Continuing Guaranty**





Lease Number       0

| 0 | By: |
| --- | --- |
| **Guarantor** | |

| | By: |
| --- | --- |
| **Guarantor** | |

| | By: |
| --- | --- |
| **Guarantor** | |

| | By: |
| --- | --- |
| **Guarantor** | |

**ACKNOWLEDGEMENT CERTIFICATE**

State of _____   County of _____

The foregoing instrument was acknowledged before me on this _____ (date) by
(name(s) of person(s) acknowledging): _____

_____

_____

_____

**(Notary Seal)**

_____
Signature of Notary Public – State of _____

My commission expires: _____



| POWER OF ATTORNEY |
|---|

Contract # _____ 0 _____

POWER OF ATTORNEY FOR: LICENSES, PERMITS, TITLES, LIENS, REGISTRATIONS, TAXES, REPORTS AND AUDITS

**KNOWN ALL MEAN BY THESE PRESENTS**          that _____ **0** _____ having an office at
_____ 0,0 0 0 _____ acting through the undersigned does hereby designate
and appoint _____ TPine Leasing Capital, L.P. _____ a _____ Limited Partnership _____ with offices located at _____ 1125 E. Alexis Rd Toledo,
OH 43612 _____ as Attorney in fact for said _____ 0 _____ for the following limited and special
purposes.

To obtain, complete, execute, review and deliver applications for the purposes of licensing, ICC authority, titling,
permitting, lien perfection, registration and filing of tax reports for fuel mileage in the United States in which motor
vehicles are leased and or operated by _____ 0 _____

This is to certify that employees of TPine Leasing Capital, L.P. have Power of Attorney to act as an agent
for _____ 0 _____ the purpose of obtaining titles, perfecting liens
and registrations for Vehicle (s) described below:

| Equipment Description (Including model, make and Serial Number) |
|---|
|  |
|  |
|  |
|  |

This **POWER OR ATTORNEY** is restricted and limited to the matters specifically set forth herein for the term
beginning          **January 0, 1900**

IN WITNESS WHEREOF _____ 0 _____ has caused these presents to be
executed by a duly authorized officer or owner hereto

0 _____
(Company Officer)

0 _____
(Company Name)

_____
(By:)

**ACKNOWLEDGEMENT CERTIFICATE**

State of _____ County of _____

The foregoing instrument was acknowledged before me on this _____ (date) by
0 _____ (name of person acknowledging).

**(Notary Seal)**

_____
Signature of Notary Public – State of _____

My commission expires:_____

**POWER OF ATTORNEY**

Contract #    0

**LIMITED POWER OF ATTORNEY FOR:  REGISTRATIONS**

**KNOWN ALL MEAN BY THESE PRESENTS**                    that                    **TPine Leasing Capital, L.P.**                    having an office at

1125 E. Alexis Rd Toledo, OH 43612                    acting through the undersigned does hereby designate

and appoint                    0                    with offices located at                    0,0 0 0

                    as Attorney in fact for said                    TPine Leasing Capital, L.P.                    for the following limited

and special purposes.

To obtain, complete, execute, review and deliver applications for the sole purposes of Vehicle registration for the following vehicles:

| Vehicle Description (Including model, make and Serial Number) |
|---|
|  |
|  |
|  |

0                                        will be leasing the listed vehicle(s) from                    **TPine Leasing Capital, L.P.**

thus TPine Leasing Capital LP. will remain owner and                    will be the Lessee.                    This Limited

Power of Attorney will expire on                    1/0/1900

This **POWER OR ATTORNEY** is restricted and limited to the matters specifically set forth herein for the term beginning **January 0, 1900**

IN WITNESS WHERE OF                    TPine Leasing Capital, L.P.                    has caused these presents to be

executed by a duly authorized officer or owner hereto

_____

(Company Officer)

TPine Leasing Capital, L.P.

(Company Name)

_____

(By)

**ACKNOWLEDGEMENT CERTIFICATE**

State of _____    County of _____

The foregoing instrument was acknowledged before me on this _____ (date) by

_____ (name of person acknowledging).

**(Notary Seal)**

Signature of Notary Public – State of _____

My commission expires: _____

EXHIBIT 3

SALES CERTIFICATE

SALES CERTIFICATE, dated as of _____, 20__, by Tpine Leasing Capital LP ("**Seller**") in favor of Hitachi Capital America Corp. ("**Purchaser**").

1.      Reference is made to that certain Master Lease Receivables Sale and Assignment Agreement dated as of April __, 2021, between Seller and Purchaser (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**").  Capitalized terms used herein without definition shall have the meanings attributed to them in the Agreement.

2.      Seller does hereby sell, assign, convey, and transfer all of Seller's right, title and interest, but none of Seller's obligations, in, under and to, all of the Transferred Assets under or relating to the Leases listed on Attachment A hereto.

IN WITNESS WHEREOF, Seller has caused this Sales Certificate to be executed by one of its duly authorized officers as of the date first above written.

TPINE LEASING CAPITAL LP,
as Seller


By: _____
Name: _____
Title: _____

- 25 -

ATTACHMENT A TO SALES CERTIFICATE DATED _____

| Master Lease Number | Lease Supplement Number | Name of Lessee | Monthly Payment | Number of Payments Sold to Purchaser | Original Term in Months | End of Lease Date |
|---|---|---|---|---|---|---|
| | | | | | | |

EXHIBIT

NOTICE OF ASSIGNMENT

Re: _____ dated _____, (the "**Lease**") between Tpine Leasing Capital LP ("**Lessor**") and _____ ("**Lessee**").

Lessor hereby gives notice to Lessee that pursuant to the terms of an assignment (the "**Assignment**") it has assigned and transferred to Hitachi Capital America Corp. ("**Assignee**") certain of Lessor's right, title and interest in and to, but none of its obligations under the Lease and all amounts of scheduled rent (whether due on the scheduled due date, by acceleration or otherwise) owing, thereunder.  In connection with the Assignment, Lessor has also granted Assignee a security interest in all of the equipment (the "**Leased Equipment**") leased under the Lease.

Lessor hereby irrevocably directs Lessee to make all payments required or permitted to he made pursuant to the Lease directly to at the following address:

_____
_____
_____

All of such payments should be payable to "_____".  Lessor agrees that payment to Assignee in accordance with the foregoing instructions will relieve Lessee of its obligation to make such payment to Lessor pursuant to the Lease.

The Assignment shall not relieve Lessor from the performance of any of its obligations under the Lease or make or cause Assignee to be liable for such obligations.  Lessee should settle all claims against Lessor, whether arising under or related to the Lease or otherwise, directly with Lessor.

Lessee hereby agrees that Lessee shall not, without Assignee's prior written consent: (i) modify or amend the Lease, (ii) assign, encumber or sublet its rights under the Lease or in the Leased Equipment, (iii) exercise any of its rights under the Lease which are exercisable only with the consent of Lessor, or (iv) return the Leased Equipment to Lessor.

A copy of each notice which Lessee is required to give Lessor under the terms of the Lease should be sent by Lessee to Assignor at its address at:

_____
_____

by overnight mail , or at such other address as may hereafter notify Lessee.**Tpine Leasing Capital LP, as Lessor**

By: _____
Name: _____
Title: _____

Agreed and Acknowledged:

**Hitachi Capital America Corp., as assignee**

By: _____
Name: _____
Title: _____

EXHIBIT 5

ON BANK LETTERHEAD

Hitachi Capital America Corp.
800 Connecticut Avenue, 4th Floor North
Norwalk, Connecticut 06854-1631
Attention:  Kim Morse


Re:      TPine Leasing Capital L.P. ("Debtor") - No Interest in Equipment (as defined)

Royal Bank of Canada, in its own capacity, and in any capacity for which it is currently or hereafter acting as secured party of record, and/or as agent, for any third parties, (the "Secured Party") has or may have a security interest or other lien ("Secured Party's Security Interest") in certain of Debtor's assets. Hitachi Capital America Corp. ("Hitachi") intends to enter into that certain Master Lease Receivables Sale and Assignment Agreement by and between Debtor and Hitachi, and certain ancillary documents and agreements related thereto (collectively, the "Transaction Documents"), pursuant to which Hitachi will purchase certain lease receivables from the Debtor as described on Schedule 1 hereto (collectively, such lease receivables so purchased by Hitachi, the "Lease Receivables") and will take a security interest in certain equipment subject to the leases pursuant to which the Lease Receivables are payable between the Debtor, as lessor, and third parties, as lessees identified on Schedule 1 (collectively, the "Equipment") to secure Debtor's obligations to Hitachi under the Transaction Documents. Secured Party hereby confirms that Secured Party does not claim, and shall not claim during any period of time where Debtor has remaining obligations under the Transaction Documents, a security interest in, other lien upon, or any other right, title or interest in the Lease Receivables, the Equipment, and/or the Loss Pool Reserve (as described herein, and collectively, the "Hitachi Assets and Collateral"). As used herein, the term "Loss Pool Reserve" means that certain reserve account maintained by Hitachi as a notional account on its general ledger, which account is primarily funded from a holdback from the purchase price of the Lease Receivables and which secures the payment and performance of the obligations and agreements of lessees under the leases from which the Lease Receivables are generated and the payment and performance of the obligations and agreements of Debtor under the Transaction Documents.

To the extent that a security interest or other lien in favor of Secured Party exists, or may hereafter exist during any time that Debtor's obligations under the Transaction Documents remain outstanding, with respect to the Hitachi Assets and Collateral, Secured Party hereby disclaims, terminates and releases any such security interest, lien or other right, title or interest in any such Hitachi Assets and Collateral in favor of Hitachi. In furtherance of the foregoing, Secured Party agrees that: (i) it will not take any action to bar, restrain or otherwise prevent Hitachi from inspecting, removing or taking possession of all

- 29 -

or any portion of the Hitachi Assets and Collateral, (ii) if Secured Party obtains possession of any Hitachi Assets and Collateral, Secured Party shall turn over such Hitachi Assets and Collateral upon Hitachi's written request therefor, (iii) the above release and disclaimer shall apply irrespective of the time or order of attachment or perfection of security interests or other liens, and (iv) if requested in writing by Hitachi, Secured Party will, at the expense of Debtor, execute and deliver, in form and substance satisfactory to Secured Party, such other documents as may be reasonably required by Hitachi to evidence the above termination, release and disclaimer.

It is expressly understood and agreed that the release set forth herein shall not apply to any assets, property or undertaking of Debtor other than the Hitachi Assets and Collateral and all existing security interests in favor of Secured Party in such assets, property and undertaking (other than the Hitachi Assets and Collateral) of Debtor and all obligations owing by Debtor to Secured Party shall remain in full force and effect. It is further understood that unless the Secured Party is in receipt of the "Payoff Amount" on or before the "Payoff Date" (as indicated on the Schedule 1 hereto associated with the designated Equipment and Lease Receivable) via wire transfer to the account specified below by the Secured Party ("Payoff"), at no time shall the Hitachi Assets and Collateral include (i) any receivable that is payable pursuant to a lease of a vehicle entered into by the Debtor as lessor and that is financed by the Secured Party or (ii) any equipment that is subject to a lease entered into by the Debtor as lessor and that is financed by the Secured Party. The release set forth herein will be effective as to each Lease Receivable and Equipment automatically and without any further action by any party upon payment to the account set forth below, in immediately available funds, the Payoff Amount on or before 4:00 p.m. EST on the Payoff Date or upon Secured Party's receipt of the Payoff Amount and other sums due and owing if received later than the Payment Date. To the extent that Secured Party has not previously financed any portion of the Hitachi Assets and Collateral, such Payoff Amount shall equal zero. The Payoff Amount, if greater than zero, shall be paid by Hitachi to Secured Party in accordance with the following wire instructions:

<u>**Wire Instructions:**</u>
**Account Name:  Royal Bank of Canada**
**Account:  _____**
**Swift:  _____**
**Routing:  _____**
**Bank:  _____**

The release set forth herein is not effective to release any rights in the Hitachi Assets and Collateral re-acquired by any Debtor upon satisfaction, in full, of Debtor's obligations under the Transaction Documents.

Secured Party represents to Hitachi that Secured Party has not heretofore assigned Secured Party's security interest in any of the Hitachi Assets and Collateral to any third-party assignee, and covenants to Hitachi that Secured Party shall not assign Secured Party's

- 30 -

Security Interest to any third-party assignee without concurrently notifying any such assignee of the existence of this agreement, delivering a true copy of same to any such assignee and obtaining the agreement of such assignee to be bound, in the same manner as Secured Party, to the terms of this agreement. This agreement shall be binding upon Secured Party's successors and assigns.

This letter agreement shall remain in full force and effect notwithstanding any modification or amendment of the Transaction Documents or any agreements between the Debtor and the Secured Party. This agreement shall be governed and construed in accordance with the laws of the State of New York (without regard to the conflict of laws principles thereof).

Yours truly,

_____

- 31 -

Master Lease Receivables Sale Agreement – Execution Copy

SCHEDULE 1 TO NO INTEREST LETTER DATED _____

| Master Lease Number and Lease Supplement Number (if any) [1] | Name of Lessee | Equipment Subject to Lease, Including All Vehicle Identification Numbers | Payoff Amount | Payoff Date |
|---|---|---|---|---|
|  |  |  |  |  |

---

[1] The Lease Receivables shall include all rents and other payments related thereto due or to become due under such Lease.

- 32 -

Master Lease Receivables Sale Agreement – Execution Copy