# Exhibit D

SERVICING AND REMARKETING AGREEMENT

This **SERVICING AND REMARKETING AGREEMENT** (this "**Agreement**"), dated as of May 25, 2021, is entered into by and between HITACHI CAPITAL AMERICA CORP., a Delaware corporation ("**HCA**"), and TPINE LEASING CAPITAL L.P.,  a Delaware limited partnership ("**TPINE**"), as the servicer (in such capacity, the "**Servicer**").

RECITALS

**WHEREAS**, pursuant to the terms of that certain Master Lease Receivables Sale and Assignment Agreement executed by and between HCA (in such capacity, the "**Assignee**") and TPINE (in such capacity, the "**Assignor**"), dated as of the same date hereof (the "**Assignment Agreement**"), Assignor intends, from time to time, to sell, transfer and assign to HCA all of its rights, title, interests in and to certain Lease Receivables (as defined in the Assignment Agreement and more specifically described in a Schedule executed and delivered from time to time by Assignor and Assignee pursuant to the Assignment Agreement) and Assignee intends, from time to time, to purchase such Lease Receivables and accept such assignment from Assignor; and

**WHEREAS**, in consideration of, and as a necessary condition to, the consummation of the transactions contemplated in the Assignment Agreement, HCA and the Servicer desire to enter into this Agreement to appoint the Servicer as agent of HCA with respect to the Lease Receivables and Equipment, as those terms are defined in the Assignment Agreement, to perform certain servicing responsibilities for the benefit of HCA and, with respect to defaulted Leases, certain remarketing responsibilities with respect to the Equipment, and the Servicer is willing to perform such servicing and remarketing responsibilities on the terms and conditions provided in this Agreement.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto formally covenant, agree and bind themselves as follows:

ARTICLE I
Definitions

**Section 1.01**  Capitalized Terms.  All capitalized terms used in this Agreement (including the recitals) that are not defined herein but are defined in the Assignment Agreement, shall have the same meanings ascribed to them in the Assignment Agreement.

**Section 1.02**  Definitions.  Whenever used in this Agreement, and unless the context otherwise requires, the words and phrases defined in the recitals hereto shall have the same meaning when used herein and the following words and phrases shall have the following meanings:

"**Advance**" shall have the meaning set forth in Section 4.02 hereof.

"**Business Day**" means any day which is not a Saturday, a Sunday or a public holiday under the laws of the United States of America or the State of New York applicable to a banking association.

"**Distribution Date**" means the 10th of each month, unless such day is a weekend or US business holiday, in which case it shall mean the first business day following such date.

"**Indemnified Amounts**" shall have the meaning set forth in Section 3.06 hereof.

"**Servicer Event of Default**" means an event specified in Section 6.01 hereof.

"**Servicing Trigger Event**" means, with respect to any Lease: (A) any failure by the Servicer to deliver to HCA any Lease Receivable, proceeds from the remarketing of Equipment, or proceeds from insurance policies pertaining to damage of any Equipment received by the Servicer within fifteen (15) days after receipt of written notice of such nondelivery from HCA; or (B) failure on the part of the Servicer to observe or to perform in any material respect any other covenants or agreements of the Servicer set forth herein in respect of such Lease, Lease Receivables or the Equipment, which failure continues without cure for a period of thirty (30) days after Servicer's receipt of written notice from HCA requesting the failure to be remedied.

"**Titled Interests**" shall have the meaning set forth in Section 9.01 hereof.

"**Titled Vehicles**" shall have the meaning set forth in Section 9.01 hereof.

## ARTICLE II
## The Lease

**Section 2.01**     Possession and Maintenance of Lease File. Except as expressly provided in this paragraph, HCA hereby appoints Servicer, and Servicer hereby accepts such appointment, to act as the agent of HCA to maintain possession of the Lease File relating to each Lease, which may be held in tangible paper form or electronic form, including, as applicable: (a) a fully executed original copy of the Lease, including all amendments and modifications thereto; (b) fully executed original copies of any assignments in the chain of title with respect to the Lease; (c) a copy of any Certificate of Title or file stamped copy of any UCC financing statement or such other documents evidencing the ownership or security interest of HCA in the Equipment, and (d) the fully executed original copy of any and all guaranty(ies) to secure Lessee's obligations under any Lease. The Servicer's possession of the Lease File shall be for purposes of administrative convenience only and shall have no bearing on HCA's ownership of the Lease Receivables or interest in any Equipment. For the avoidance of doubt, the fully executed original of each Lease, and all original assignments thereof shall be held by Servicer, and the original Certificates of Title for all Equipment shall be held by HCA as additional security for the obligations of Servicer hereunder and under the Assignment Agreement.

**Section 2.02**     Duties of Servicer Regarding Possession of the Lease Receivables.

(a)     Safekeeping. The Servicer shall hold and maintain each Lease File on behalf of HCA and shall maintain such accurate and complete accounts and records pertaining to the Lease File as shall enable the Servicer to comply with its obligations under this Agreement. In maintaining possession of each Lease File, the Servicer shall act with reasonable care, using that degree of skill and attention that the Servicer exercises with respect to the Lease Files relating to all comparable leases and similar agreements that it services for itself. The Servicer's accounting records will reflect the sale, assignment, transfer and conveyance of each Lease Receivable to HCA.

(b)     Maintenance of and Access to Records. The Servicer shall maintain each original Lease File at its offices or at a secure offsite documentation storage facility or in electronic form in accordance with its documentation retention policies. Within fifteen (15) days after Servicer's receipt of written notice

from HCA, the Servicer shall allow HCA or its representative to review each Lease File (for inspection purposes only). With thirty (30) days of Servicer's receipt of prior written notice from HCA, the Servicer will allow HCA or its representative to conduct an annual on-site audit of the Lease Files and review documents, data and information relating to Servicer's servicing function hereunder at such offices of the Servicer during normal business hours.

(c)     Release of Documents.  In no event shall the Servicer release the Lease File, or any portion thereof, to any party other than HCA, other than as required by law or court order, without the prior written consent of HCA, which consent shall not be unreasonably withheld, delayed or conditioned. If a Servicer Event of Default occurs under this Agreement, the Servicer shall release all Lease Files in accordance with Section 7.02. If a Servicing Trigger Event occurs with respect to a Lease or if a Lease is terminated, the Servicer shall promptly (and in no event more than five (5) Business Days) upon receipt of written demand of HCA, release the affected Lease File (excluding any documents required to be returned to the related Lessee) to HCA or its designee.

(d)     Lease Default; Servicing Trigger Event.

(1)   In the event of a Lease Default, HCA shall have the right to terminate this Agreement with respect to the affected Lease and may assume the servicing responsibilities under this Agreement (or attempt to locate a successor servicer).

(2)   Upon the occurrence of a Servicing Trigger Event, HCA may, at its option, by notice to Servicer within ten (10) days of expiry of the applicable grace or cure period, terminate this Agreement and assume the related servicing responsibilities (or attempt to locate a successor servicer).

**Section 2.03**     Title to the Lease Receivables.  The Servicer agrees that the Servicer will not at any time have or in any way attempt to assert any interest in any Lease Receivables; *provided, however*, that the Servicer shall have rights in, and be entitled to retain amounts payable to the Servicer with respect to any Lease or the Equipment solely to the extent explicitly set forth herein or in the Assignment Agreement and the related Schedule pursuant to which HCA acquired such Lease and the related Equipment. Servicer shall deliver to HCA, at Closing, and in accordance with the notice provisions set forth in the Lease, a copy of the fully executed Notice of Assignment, which shall be held by HCA until the occurrence of a Servicing Triggering Event and/or a Lease Default. Servicer shall maintain proof of such delivery of the Notice of Assignment to Lessee in the Lease File.

## ARTICLE III
### Administration and Servicing of each Lease

**Section 3.01**     Duties of Servicer.

(a)     The Servicer as agent for HCA shall manage, service, administer and make collections on each Lease with reasonable care, using that degree of skill and attention that the Servicer exercises with respect to all comparable leases and similar agreements that it services for itself; *provided, however*, in no event shall such care fall below standards of commercial reasonableness. The Servicer's duties shall include, without limitation, billing, collection, receiving and posting of all payments

(including, without limitation, Lease Receivables and any taxes pertaining to the Lease and/or the Equipment), and providing all required tax information for all sales, use and personal property taxes required to be paid in connection with the Lease or the Equipment, responding to the Lessee's inquiries, investigating delinquencies, sending payment invoices to the Lessee, accounting for collections, providing and receiving notices due under the Lease, and executing all documents required under the Lease; *provided, however*, except as expressly permitted by Section 3.02 with respect to Permitted Actions, as defined herein, the Servicer shall not execute any document in connection with the Leases without the prior written consent of HCA, except in the event of a Repurchase.  For the avoidance of doubt, Servicer shall (i) bill for, collect and receive all sums payable under each Lease, including sales, use and personal property taxes and (ii) remit to the appropriate agencies, all sale, use and personal property taxes required to be paid in connection with each Lease (the amounts of which shall be withdrawn, paid or transferred from the Lease Receivables Deposit Account by Servicer), or, in the event no sales tax is due under a Lease, then Servicer shall obtain a tax exemption certificate from the Lessee.  The Servicer shall follow its customary standards, policies and procedures for transactions it holds for its own account in performing all of its duties as the Servicer.  HCA shall furnish the Servicer with any powers of attorney and other documents reasonably necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

(b) Notwithstanding Section 3.01(a), in the event of a Lease Default under a Lease by the related Lessee, HCA shall have the sole right (and the Servicer shall not have any obligation) to exercise any and all remedies available to HCA in connection with such Lease Receivables that are the subject of such Lease Default.  If specifically requested by HCA in writing, however, and subject to Section 3.01(c), the Servicer shall continue to serve as agent hereunder and/or shall take such actions as reasonably may be requested by HCA to enforce HCA's rights with respect to the Lease Receivables due and owing under such Lease upon the occurrence of a Lease Default.  For the avoidance of doubt, nothing in this subparagraph shall limit or restrain any obligation of Assignor under the Assignment Agreement, including with respect to the Loss Pool Reserve.

(c) Upon the written direction or with the prior written consent of HCA, the Servicer shall enforce rights or take action on HCA's behalf with respect to any Lease Receivable that is the subject of a Lease Default, including, without limitation, by repossessing the related Equipment.  Upon the written request of HCA, the Servicer shall provide HCA with all information and documents relating to any actions taken by Servicer on HCA's behalf with respect to such Lease Receivables.  In addition, the Servicer agrees to reasonably cooperate and assist HCA with respect to any actions taken by HCA with respect to any Lease Receivable that is the subject of a Lease Default.  HCA hereby (a) acknowledges that Servicer may also be enforcing rights or may be a party to such action in its capacity as owner or servicer of other Leases with the same Lessee, and (b) should a conflict of interest arise, such conflict must either be waived in writing by all parties, if capable of being waived, and/or may require Servicer and HCA to retain separate counsel.  HCA acknowledges that neither Servicer or its employees nor any counsel engaged by Servicer (including with respect to any enforcement actions for any Lease) will provide legal advice to HCA, and HCA shall retain its own counsel to provide legal advice and, if applicable, legal representation with respect to the Leases or the Lease Receivables.  If HCA does not promptly provide the requisite authorizations and directions as requested by Servicer within any deadlines necessary for actions in legal proceedings or as otherwise could adversely affect the enforcement of HCA's rights under any Lease, or if the Servicer determines that as a result of a conflict of interest between HCA and Servicer with respect to enforcement actions involving the same Lessee it is advisable for Servicer to no longer act as Servicer on behalf of HCA for such Lease Receivables, the Servicer may resign as Servicer for such

Lease and related Lease Receivables immediately upon prior written notice to HCA. Notwithstanding the foregoing, the Servicer shall not be under any obligation to initiate, appear in, prosecute or defend any legal or enforcement action that, in its reasonable opinion, may result in any unreimbursed expense or involve Servicer in any liability.

(d) Servicer shall (i) continue to conduct "Know your Customer" and due diligence screening of each Lessee under any Lease in accordance with Servicer's normal operating procedures for transactions held for its own account, and (ii) promptly notify HCA in writing of any alerts or other notices that any Lessee provides to Servicer advise HCA of risk pertaining to "Know your Customer" obligations. In the event any Lessee or any person that owns or controls any Lessee is subject to one of the foregoing events, the parties shall cooperate and take any appropriate actions required to be taken by law. Within 5 days of Servicer's receipt of prior written request of HCA, Servicer agrees to deliver to HCA any information reasonably requested by HCA in order for HCA to conduct any screening of any Lessee and confirming whether any Lessee is subject to one of the foregoing events.

**Section 3.02**     <u>Collection of Lease Receivables and Other Actions</u>.

(a) The Servicer shall make reasonable efforts to collect all Lease Receivables as and when the same shall become due in accordance with the customary procedures the Servicer follows with respect to all comparable leases or similar agreements that it services for itself.

(b) Unless such action is a Permitted Action, as defined herein, the Servicer shall not enter into any agreement or take, or fail to take, any action which:

    (i) permits amendment, modification or waiver of any of the terms of any Lease; or

    (ii) releases, substitutes, exchanges or otherwise conveys any Equipment (or any interest therein) under, any guaranty of or any security for the Lease in whole or in part except in the event of payment in full by the Lessee, a Repurchase or, in connection with the substitution of Equipment, as expressly permitted under such Lease and this Agreement;

    (iii) materially impairs or jeopardizes the right, title and interest of HCA in any Lease Receivables, Lease or related Equipment;

    (iv) accelerates or otherwise changes any of the payment terms of any Lease;

    (v) settles any insurance claim resulting from insurance maintained by Lessee with respect to any casualty to, theft of, or other loss of any Equipment;

    (vi) agrees to any prepayment or early termination of any Lease, except as otherwise expressly permitted hereunder;

    (vii) agrees to any renewal term or renewal rent amount not expressly permitted by the Lease; or

    (viii) agrees that any Lessee has met its obligations under any Lease.

For purposes of this Section, a "**Permitted Action**" includes with respect to any Lease or Lease Receivables, entry into any agreement, or the taking, or failure to take, any action: (1) expressly permitted under this Agreement, (2) required by law or court order, (3) expressly required by, or prohibited by, as applicable, the terms of such Lease, and/or (4) for which HCA has provided its prior written consent.

(c) The Servicer will promptly provide to HCA copies of any amendments, modifications, waivers or other documents executed and delivered by Servicer with respect to any Lease or Equipment, and certain other reports as may be reasonably requested in writing by HCA.

**Section 3.03**  Insurance.  In accordance with Servicer's customary standards, policies and procedures for transactions it holds for its own account, the Servicer shall require that each Lessee shall, at all times, (a) have obtained and maintain in full force and effect physical damage insurance as provided in the Lease covering the Equipment, and (b) have obtained and maintain liability insurance in such amounts and for such risks as set forth in the Lease, including, but not limited to, fire, extended coverage, vandalism and theft insurance.  All such insurance coverage shall be provided by insurance companies that have an A.M. Best Co. Financial Strength Rating of "A-" or better.  The Servicer and its successors and assigns shall be named as loss payee and/or additional insured under any such insurance policies.  In addition, the Servicer or its designee shall track Lessee's insurance coverage and the renewals thereof and deliver to HCA a monthly report showing: (i) the status of any Lessee's insurance coverage, (ii) whether such insurance coverage has expired or been cancelled, (iii) physical damage insurance as required under the Lease covering the Equipment, (iv) liability insurance in such amounts and for such risks as set forth in the Lease and (v) any actions taken by Servicer or its designee to cause any Lessee to deliver to Servicer or its designee evidence of such insurance coverage where evidence of such coverage had not been delivered to Servicer or its designee.  In the event Servicer receives notice or otherwise becomes aware that any physical damage insurance or liability insurance has expired, is not in compliance with the terms and conditions of the Lease, or has been cancelled, Servicer shall, within thirty (30) days after receipt of such notice, deliver a letter to the applicable Lessee demanding that Lessee deliver to Servicer a new certificate of insurance evidencing that such Lessee has physical damage and liability insurance in effect in accordance with the terms and conditions of the Lease.  Notwithstanding anything in the Assignment Agreement, in the event Servicer breaches any of its obligations under this Section 3.03 and HCA is unable to recover any insurance proceeds in an amount that would have been received if the Lessee had maintained insurance in accordance with the terms of the Lease that is the subject of such breach, then HCA shall withdraw from the Loss Pool Reserve, an amount equal to the amount of insurance proceeds that HCA would have received if the Lessee had maintained insurance in accordance with the terms of the Lease.

**Section 3.04**  Covenants of Servicer.  Except as otherwise provided in this Agreement or agreed by HCA in writing, the Servicer shall not take any action that has an adverse effect on the rights of HCA in the Lease Receivables, the Lease or the related Equipment.

**Section 3.05**  Periodic Information.  The Servicer shall provide HCA, within five (5) Business Days after receipt of a written request from HCA, a copy of any reports, financial statements, notices and other information provided or required to be provided by the Lessee pursuant to the Lease and actually received from the Lessee by the Servicer.

**Section 3.06**    Expenses and Liabilities; Servicer Indemnity.  Except as expressly set forth in this Agreement, all liabilities, obligations, losses, penalties, expenses, disbursements, costs and damages incurred by the Servicer, or for which the Servicer is responsible, directly or indirectly, in connection with or arising as a result of the Lease or the Equipment (including, without limitation, those arising due to suit, claims, or counterclaims by an Lessee or any other person against the Servicer or by the Servicer to enforce rights and remedies under the Lease) which are not paid by the Lessee (or others, on behalf of such Lessee) shall be the responsibility of Servicer.  Servicer shall indemnify HCA for all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigative or defense, including those incurred upon any appeal) (collectively, "**Indemnified Amounts**") which may be imposed on, incurred by or asserted against HCA in any way arising out of or relating to (i) Servicer's actions or inactions under the Lease, except when at the direction of HCA, (ii) any material breach by Servicer of any of its obligations under this Agreement or the Assignment Agreement; or (iii) Servicer's gross negligence or willful misconduct in the performance of its duties hereunder.  Servicer shall not be entitled to any compensation from HCA for the performance of its obligations under this Agreement.

**Section 3.07**    Prepayment.

(a)    If an event of loss has occurred with respect to any item or items of Equipment, the Servicer shall remit to HCA all payments made by or on behalf of the Lessee in accordance with the applicable Lease, with respect to such Equipment, such event of loss (including any stipulated loss value related to such item or items of Equipment), any proceeds from insurance policies covering the Equipment and any Lease Receivables, in each case to the extent actually received by the Servicer.

(b)    Except as otherwise provided in Section 3.07(c) or in the Assignment Agreement, Servicer and HCA hereby agree that if any Lessee requests early termination or payment of a Lease expressly permitted under the Lease, HCA hereby authorizes Servicer to quote to the Lessee an early termination or payment amount in an amount in accordance with the relevant Lease. The Servicer shall immediately provide written notice to HCA of the amount and terms of any such early termination or payment.  If the Lessee and Servicer agree to an early payment amount in accordance with the preceding sentence, upon Servicer's receipt of such payment amount, the Servicer shall promptly remit such payment amount to HCA.

(c)    For the avoidance of doubt, a voluntary prepayment of a Lease as described in Section 3.07(b) above shall not include, (1) any prepayment resulting from the exercise of remedies following an Event of Default, or (2) in connection with a prepayment that arises as a result of a casualty loss, or (3) if Servicer or one of its Affiliates refinances the Equipment for the Lessee or finances the Lessee's acquisition of Equipment as an upgrade of or replacement for the Equipment.

## ARTICLE IV
## Collections; Distributions

**Section 4.01**    Collections.  The Servicer shall deposit upon receipt, and hold in trust as agent for HCA, all amounts received in connection with the Leases and the related Equipment in a segregated deposit account (the "**Lease Receivables Deposit Account**") and shall withdraw from such Lease Receivables Deposit Account only such amounts required to be disbursed on each Distribution Date in accordance with Section 4.03 hereof.  The Lease Receivables Deposit Account shall be maintained at a bank

acceptable to HCA in its sole discretion, shall be subject to a deposit account control agreement in favor of HCA, and Servicer shall not deposit any Lease Receivables, insurance proceeds related to the Equipment, or any other proceeds of the Equipment into an account other than the Lease Receivables Deposit Account without the express written consent of HCA.  HCA shall be permitted to monitor all deposits and disbursements from the Lease Receivables Deposit Account.

**Section 4.02**     Distributions.  On each Distribution Date, HCA shall cause to be withdrawn, by automated clearing house ("ACH") transfer, the aggregate scheduled Lease Receivables purchased by HCA and due during the entire calendar month *preceding* the month in which such Distribution Date occurs, including any Advance, as that term is defined herein.  In addition, the Servicer shall remit to HCA by wire transfer any prepayments and other payments, including insurance proceeds, made under the Lease on or prior to the Distribution Date following the receipt of such payment.  The amount of any Lease Receivables advanced by Servicer to HCA prior to receipt thereof is referred to herein as an "**Advance,**" and the Servicer shall have the duty to maintain a sufficient balance in the Lease Receivables Deposit Account to make each Advance required hereunder, provided, however, that Servicer will not make more than two (2) consecutive Advances with respect to any Lease if any previous due Lease Receivable is unpaid by the Lessee.  Servicer shall be obligated to make an Advance only to the extent that Servicer determines, in good faith, that such Advance will be recoverable from such Lessee.  Servicer shall notify HCA in writing if Servicer has not received all or any portion of any Lease Receivable for which Servicer has made an Advance within thirty (30) days after the applicable Distribution Date. HCA acknowledges and agrees that a Lessee may have additional schedules with a Lessee serviced by the Servicer that are not owned (beneficially or otherwise) by HCA and in the event the payments received from a Lessee are not designated by Lessee or if no schedule is specified, then such payments shall be applied without prejudice to or discrimination against HCA or any Lease Receivables assigned to HCA in accordance with its customary procedures. Upon the written request of HCA, Servicer shall provide HCA with an accounting of any payments that were distributed by Servicer pursuant to the preceding sentence.  Servicer shall be entitled to retain as servicing compensation any late charges relating to any Lease Receivable with respect to which Servicer has made an Advance.

**Section 4.03**     Reports.   On or prior to each Distribution Date, Servicer shall deliver to HCA a written or electronic report containing the following information with respect to each Lease: (a) the name of the applicable Lessee, (b) a payment history of the amounts and dates of each Advance made with respect to such Lease, (c) a payment history of the amounts and dates of each Lease Receivable and other payments received by Servicer with respect to such Lease, (d) a payment history of the amounts and dates of each reimbursement made by HCA to Servicer for any unpaid Advances and (e) a list and description of any delinquent Lease Receivable with respect to such Lease.

**ARTICLE V**
**The Servicer**

**Section 5.01**     Merger or Consolidation of, or Assumption of the Obligations of, Servicer.  Any person (i) into which the Servicer may be merged or consolidated, (ii) which may result from any merger or consolidation to which the Servicer shall be a party, or (iii) which may succeed to the properties and assets of the Servicer substantially as a whole, which person in any of the foregoing cases executes an agreement of assumption to perform every obligation of the Servicer under this Agreement, shall be the successor to the Servicer hereunder without the execution or filing of any document or any further act by any of the parties to this Agreement.

**Section 5.02**    Limitation on Liability of Servicer and Others. Neither the Servicer nor any of the directors, officers, members, employees or agents of the Servicer shall be under any liability to HCA, *provided, however*, that this provision shall not protect the Servicer or any such person against any liability that would otherwise be imposed by reason of willful misfeasance, gross negligence, willful misconduct, bad faith, or breach by Servicer of its obligations and duties under this Agreement.  Further, the Servicer shall not be liable for its failure to take action that, in its good faith belief, would cause it to violate applicable laws or the terms of any Lease.  The Servicer and any director, officer, member, employee or agent of the Servicer may rely in good faith on any document of any kind that reasonably appears to be properly executed and submitted by any person respecting any matters arising under this Agreement.  Servicer may exercise its powers and perform its duties as agent by or through such attorneys, agents and servants as it shall appoint.

ARTICLE VI
**Servicer Events of Default**

**Section 6.01**    Servicer Events of Default.  If any one of the following events shall occur and be continuing it shall constitute an event of default by the Servicer under this Agreement (a "**Servicer Event of Default**"):

    (a)    The entry of a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator, receiver or liquidator for the Servicer in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days;

    (b)    The consent by the Servicer to the appointment of a conservator, receiver or liquidator in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Servicer or relating to substantially all of its property; or the admission by the Servicer in writing of its inability to pay its debts generally as they become due and filing of a petition to take advantage of any applicable insolvency or reorganization statute, making an assignment for the benefit of its creditors or voluntarily suspending payment of its obligations;

    (c)    Assignor or any of its Affiliates are in breach of any of their obligations under the Assignment Agreement or any other contract or agreement with HCA or its Affiliates; or

    (d)    A Servicing Trigger Event has occurred and is continuing with respect to a Lease;

then, and in each and every such case, so long as a Servicer Event of Default shall not have been remedied or waived, HCA, by notice then given in writing to the Servicer, may terminate all of the rights and obligations of the Servicer under this Agreement with respect to the Lease Receivables or the Equipment and may, at its sole option and without any obligation to do so, exercise any or all of the following remedies:

        (i)    Notwithstanding Section 4, request the immediate remittance of any amounts held by Servicer on its behalf;

Servicing and Remarking Agreement – Execution Copy

(ii) Notify the Lessees that all amounts must be remitted directly to HCA and/or execute and deliver a Notice of Assignment in the form annexed as an exhibit to the Assignment Agreement, to the Lessee pursuant to the terms of the Assignment Agreement;

(iii) Terminate all of the rights and obligations of the Servicer under this Agreement (other than any such rights that Servicer may have relating to any event that occurs on or before such termination date, and any rights that expressly survive the termination of this Agreement);

(iv) Remarket any Equipment, provided, however, that Equipment placed in the possession of HCA in accordance with this provision shall be subject to a comprehensive diagnostic repair estimate and inspection; and

(iv) Exercise any and all remedies available to it under applicable laws, in equity or otherwise.

## ARTICLE VII
### Effective Period and Termination

**Section 7.01**     <u>Effective Period and Termination</u>.  This Agreement shall become effective upon the execution and delivery hereof.  Subject to Sections 2.02(d) and 6.01 hereof, the respective obligations and responsibilities of the Servicer and HCA created hereby shall terminate (i) upon the payment of the last Lease Receivable under any Lease and distribution of such Lease Receivable to HCA as herein provided or liquidation of the Lease and the disposition of any amounts received upon liquidation of the Lease to HCA as herein provided, and (ii) the payment of any amounts due to the Servicer hereunder.  In the event of a Servicer Event of Default, HCA, in its sole discretion, shall have the right to terminate this Agreement, and attempt to locate a successor servicer.  The Servicer shall cooperate with HCA to ensure a smooth transition of the Servicer's duties and obligations under this Agreement to HCA or its designee.  All reasonable fees and charges in connection with transferring the servicing of the Lease Receivables pursuant to Section 6.01 shall be paid by the Servicer. Notwithstanding any replacement of the Servicer, any reasonable fees and expenses, and claims accrued by the Servicer pursuant to this Agreement prior to the termination of the Servicer and the transition of servicing to a successor servicer shall be paid promptly by HCA to the Servicer.

**Section 7.02**     <u>Preservation and Return of Lease Files</u>.  In the event Servicer ceases to act as servicer pursuant to Section 6.01 hereof, the Servicer shall, at its own expense, maintain and preserve all Lease Files, and shall, upon the request of HCA, deliver to HCA or its designee the Lease Files or such portions thereof as HCA may request in writing; *provided, however*, that the Servicer may retain a copy thereof for its own records.

## ARTICLE VIII
### Remarketing Services

**Section 8.01**     <u>Remarketing of Equipment after a Lease Default</u>.

(a)     After a Lease Default, and so long as HCA retains a right, claim or interest in the Equipment subject to such Lease, the Servicer shall act as HCA's exclusive agent for the remarketing of the Equipment as directed in writing by HCA, provided, however, that nothing contained herein shall impair HCA's rights and remedies with respect to the Loss Pool Reserve under the Assignment Agreement. The Servicer hereby accepts such appointment as remarketing agent as directed in writing by

HCA, and further agrees that it shall act as the remarketing agent without further costs or fees payable by HCA.

(b) For all Leases under which the Servicer acts as HCA's agent for the remarketing of the Equipment after a Lease Default, unless otherwise agreed to in writing by HCA and the Servicer, all net proceeds of remarketing will be applied: first, to reduce any amounts owed by the applicable Lessee with respect to the Lease Receivables, and second, to Assignor or Lessee, whichever is entitled to such amount under the Lease, or as otherwise required by law. All out of pocket costs and expenses incurred by Servicer shall be paid out of the Loss Pool Reserve.

(c) Servicer shall exercise the same level of care, detail and diligence to perform its remarketing duties hereunder as it exercised on Equipment owned by Servicer.

## ARTICLE IX
## Titling Agency

**Section 9.01**  Vehicle Titling Agent.  For the purposes of this Article IX, the items of Equipment that are subject to requirements of applicable laws requiring the recordation or other indication of ownership or security interests in such Titled Vehicles on a Certificate of Title are referred to collectively as the "**Titled Vehicles**".  HCA is granted a security interest in all rights, claims and interests of Servicer in and to all Titled Vehicles (the "**Titled Interests**"), and Servicer shall deliver to HCA all original Certificates of Title evidencing all Titled Interests within ninety (90) days of the execution of any Schedule, or such other period of time as may be required for the Department of Motor Vehicles to evidence the lien of Servicer on Title.  Without limiting the generality of the foregoing, Assignor hereby agrees to take such actions and execute such instruments as may be necessary or appropriate to carry out the intent and purpose of the transfers and assignments set forth herein and to take only such action with respect to the Titled Vehicles as Assignee may specifically instruct.

**Section 9.02**  Appointment of Servicer as Agent.  HCA hereby appoints Servicer as HCA's agent for the purpose of evidencing and perfecting HCA's lien in the Titled Vehicles, for the benefit of HCA, its successors and assigns; *provided, however*, that there is no obligation on behalf of Servicer to evidence HCA's lien against such Titled Vehicle on a Certificate of Title.

**Section 9.03**  Acceptance of Appointment.  Servicer hereby accepts its appointment as agent.  The parties agree that, without the prior written consent of Assignee, and so long as any Lease Receivables remain outstanding, Assignor shall not to take or permit any action that would encumber the Titled Vehicles or convey any legal or equitable title thereto or interest therein.

**Section 9.04**  Limitation of Liability; Indemnity.  (a) Assignor shall not be liable to Assignee for any action taken or omitted to be taken by it under this Article IX, except for Assignor's gross negligence or willful misconduct or breach of the terms of this Article.  In acting in the future as Assignee's agent under this Agreement, Assignor may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties; and Assignor shall not be bound to make any investigation into the facts or matters stated in any such resolution, certificate, statement, instrument, opinion, report, notice, request,

direction, consent, order or other paper or document.  Assignor shall not be required to take any action nor shall any provision set forth herein be deemed to impose a duty on Assignor to take any action, if Assignor shall have been advised by counsel that such action is contrary to the terms of the obligation or is otherwise contrary to law.  (b) Assignee, on Assignor's behalf, hereby agrees to enforce the indemnification provisions of the Leases against the Lessee.  If Assignor shall have become entitled to be indemnified by Lessee, and if Lessee shall have refused to indemnify Assignor under the applicable indemnification provisions of the Leases or otherwise, then Assignee also hereby agrees itself to indemnify or to act on behalf of Assignor against Lessee, as applicable, and defend and hold harmless Assignor, its agents, employees, successors and assigns, from and against any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities whatsoever arising out of or in connection with the Titled Vehicles and Assignor's status as Assignee's agent, including, without limitation, any claim or demand based upon any STRICT OR ABSOLUTE LIABILITY IN TORT, except to the extent that any of the same may arise as the result of Assignor's bad faith, gross negligence, willful misconduct or breach of its obligations under this Agreement or any Assignment Document.

**Section 9.05**   Insurance.  For so long as Assignor continues as agent under this Article, neither Assignor nor Assignee agrees to permit the insurance provisions of the Leases to be amended without either party's prior written consent, and each such party agrees promptly to notify the other if it becomes aware that the Lessee shall fail to be in compliance with any of the insurance provisions of the Leases.

**Section 9.06**   Term of Appointment.  Unless sooner terminated in accordance with the Assignment Agreement, the term of Servicer's appointment as agent under this Article shall extend until the Lease Receivables under all Schedules have been paid in full, or the Leases shall have expired or otherwise terminated and the Titled Vehicles shall have been sold or otherwise finally disposed of, *provided, however,* that: (i) any party may terminate its obligations with respect to new, and not previously serviced, Leases and Lease Receivables under this Agreement on any anniversary of this Agreement, provided such party gives not less than ninety (90) days written notice to the counter-parties to the Agreement, and (ii) HCA may terminate Servicer's obligations under this Agreement with respect to any Lease Receivables, Leases or Equipment on thirty (30) days written notice, for cause.

**Section 9.07**   Fees and Expenses.  Assignor serves under this Agreement as agent without any fee, and as further consideration for the agreement to enter into the Assignment Agreement.  Notwithstanding any other provisions of this Agreement, Assignor shall be responsible for all out-of-pocket costs and expenses incurred from and after the date hereof customarily borne by the owner of property substantially similar to the Titled Vehicles, including but not limited to expenses incurred during later stage servicing such as skip tracing fees including door knock services, courier expenses, and credit bureau pull fees as well as any expenses incurred during the course of repossessing and remarketing Titled Vehicles, Assignor shall bear all out-of-pocket costs and expenses incurred by Assignor at any time in connection with obtaining replacement certificates of title for the Titled Vehicles, provided, however, that Assignor shall not bear or otherwise be responsible for such costs and expenses in the event that the term of Assignor's appointment as agent under this Section is terminated (a) by Assignee following a Servicer Event of Default; or (b) by Assignor for any reason other than as the result of (i) a default by Assignee in the performance of any of its obligations owing to Assignor pursuant to this Article which remains uncured or unremedied for a period of thirty (30) days following written notice thereof from Assignor, or (ii) a Lease Default has occurred and is continuing.

**Section 9.08**  Delivery of Documents; Power of Attorney.  Assignor hereby agrees, promptly upon request of Assignee, to deliver to Assignee all notices or other communications (including, without limitation, the original Certificates of Title) received by Assignor with respect to the Titled Vehicles.  In order to facilitate the disposition or sale of the Titled Vehicles following a Servicer Event of Default or such other circumstances as would permit HCA to remarket any Equipment, Assignor shall execute and deliver in favor of HCA a Special Power of Attorney in the form attached hereto as Schedule A.  Assignee shall immediately notify Assignor in writing of the exercise by Assignee of its rights and powers under the Power of Attorney, including, without limitation, a description of the actions taken thereunder and such other information as Assignor may reasonably request.  Notwithstanding the foregoing, for any Lease assigned under a Specification without notice to the Lessee, the Assignee may not exercise the rights provided under the Power of Attorney unless a Servicer Triggering Event or a Lease Default has occurred and is continuing.

## ARTICLE X
## Miscellaneous Provisions

**Section 10.01**   Amendments.  This Agreement may be amended or modified only by written agreement between the Servicer and HCA.

**Section 10.02**    Governing Law; Waiver of Jury Trial.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY COURT OR JURISDICTION.  THIS WAIVER IS IRREVOCABLE AND ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT (INCLUDING, WITHOUT LIMITATION, LEASE, TORT, BREACH OF DUTY, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS).  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Section 10.03**  Venue.  Each of HCA and Servicer submits for itself and its property in any legal action or proceeding relating to this Agreement or any documents executed and delivered in connection herewith, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the courts sitting within the jurisdictional confines of the United States District Court for the Southern District of New York, any state courts within New York, New York, and appellate courts thereof.

**Section 10.04**    Notices.  All notices and other communications hereunder shall be in writing and either (a) personally delivered, delivered by air courier or sent by  certified mail: (i) if to the TPINE or Servicer, to Tpine Leasing Capital LP, 34880 Lyndon B. Johnson Fwy, Dallas, TX 75241, Attention:  Mr. Chris Petersen; and (ii) if to HCA, to Hitachi Capital America Corp., 800 Connecticut Avenue, 4th Floor North, Norwalk, Connecticut 06854-1631, Attention: Ms. Kim Morse; or (b) by email return receipt requested, (i) if to TPINE or the Servicer, to Mr. Chris Petersen, with an email address of chris@pridegroupenterprises.com; and (ii) if to HCA, to Ms. Kim Morse, VP Transportation Operations with an email address of kmorse@hitachicapitalamerica.com; or (iii) in the case of any notice delivered

in accordance with clause (a) or clause (b), at such other address as any party shall from time to time designate in writing to the other parties, which new address shall be effective from the date of receipt.

**Section 10.05**   Severability of Provisions.  This Agreement, together with the Assignment Agreement, is intended by the Parties to constitute a single transaction and agreement.  The Assignment Agreement and this Agreement have been negotiated contemporaneously and the execution of either such document is conditioned upon the simultaneous execution of the other such document.  A default under the Assignment Agreement shall constitute a default under this Agreement and, if any one or more of the covenants, agreements, provisions, or terms of this Agreement or the Assignment Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions, or terms shall be deemed severable from the remaining covenants, agreements, provisions, or terms hereof and shall in no way affect the validity or enforceability of the other provisions of this Agreement and the Assignment Agreement.

**Section 10.06**   Assignment.  HCA may assign its rights and interests hereunder without the consent of Servicer, but shall provide prior written notice of such assignment.  Subject to Section 5.01, Servicer may not assign any of its rights or obligations in this Agreement without the prior written consent of HCA; *provided however*, that Servicer may assign, transfer, hypothecate or otherwise convey its rights and obligations to an affiliated entity without the prior express written consent of the other party.  HCA shall bear all reasonable out-of-pocket costs of the Servicer incurred as a result of any assignment of a Lease Receivable by HCA to any person other than the Servicer.  Notwithstanding the foregoing, the Servicer may, at any time without notice or consent, delegate any or all of its duties under this Agreement to any affiliate, and may delegate any of its specific duties under this Agreement to any person, including any affiliate; *provided*, that the Servicer shall remain obligated and be liable for the servicing and administering of the Lease Receivables in accordance with the provisions herein without diminution of such obligation and liability by virtue of any such delegation.

**Section 10.07**   Counterparts.  This Agreement may be executed in counterparts by the parties thereto, and each such counterpart shall be considered an original, and all such counterparts shall constitute one and the same instrument.

**Section 10.08**   Headings.  The headings of sections contained herein are provided for convenience only.  They form no part of this Agreement and shall not affect the construction or interpretation of this Agreement.

**Section 10.9**   Anti-Corruption.  Each of HCA and the Servicer represents that it has not received or been offered any illegal or improper bribe, kickback, payment, gift or thing of value from the other party or their respective agents in connection with this Agreement.  Reasonable gifts and entertainment provided in the ordinary course of business do not violate the above restriction.

**Section 10.10**   Further Assurances.  Upon the parties' and their successors' and assigns' reasonable request, the parties further covenant and agree to do, execute and deliver, or cause to be done, executed and delivered, and covenant and agree to use their best efforts to cause their successors and assigns to do, execute and deliver, or cause to be done, executed and delivered, all such further acts, transfers and assurances reasonably necessary to carry out the purposes and intent of this Agreement and to better assure and confirm unto the Assignee and its successors and assigns, the receipt of the Servicer's responsibilities and obligations under this Agreement.

**Section 10.11**  <u>Survival</u>.  The terms and conditions set forth in Articles 3, 4, 5, 8, 9 and 10 of this Agreement shall survive the expiration or earlier termination of this Agreement.

**Section 10.12**  <u>Confidentiality</u>.  Each party hereto agrees that it shall treat as confidential all information provided by the other party (the "Disclosing Party") to such party (the "Recipient") or to which the Recipient obtains access, including information regarding its business, financial affairs, operations or otherwise, including without limitation, customer information, and Personal Information ("Confidential Information"). In maintaining the confidentiality of the Confidential Information of a Disclosing Party, Recipient shall exercise the same degree of care that Recipient exercises with respect to its own Confidential Information of a similar nature, including the use of customary data protection procedures, and in no event less than a reasonable degree of care. All Confidential Information of a Disclosing Party shall be used by the Recipient solely for the purposes of the servicing and monitoring contemplated pursuant to this Agreement and shall not be disclosed to any party other than such Recipient's (i) employees and Lessors who have a need-to-know for purposes of performing such Recipient's obligations under this Agreement, provided, that, such persons and entities are bound by confidentiality provisions at least as stringent as those contained herein, (ii) regulators or examiners, and (iii) auditors and legal counsel, to the extent required in connection with the transactions contemplated herein.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Servicer and HCA have caused this Servicing and Remarketing Agreement to be duly executed as of the day and year first above written.

**TPINE/SERVICER:**

TPINE LEASING CAPITAL L.P.

By: *[signature]*

Title: **President**

**HCA:**

HITACHI CAPITAL AMERICA CORP.

By: _____

Title: _____

**IN WITNESS WHEREOF**, the Servicer and HCA have caused this Servicing and Remarketing Agreement to be duly executed as of the day and year first above written.

**TPINE/SERVICER:**

TPINE LEASING CAPITAL L.P.

By:_____

Title: _____

**HCA:**

HITACHI CAPITAL AMERICA CORP.

By: _*[signature]*_____

Title: _SVP & GM_____

## SCHEDULE A

## SPECIAL POWER OF ATTORNEY

**KNOW ALL PERSONS BY THESE PRESENTS:** That the undersigned has made, constituted and appointed, and by this Power of Attorney does make, constitute and appoint HITACHI CAPITAL AMERICA CORP. (hereinafter referred to as "<u>Beneficiary</u>"), as its true and lawful attorney for it and in its name, place and stead, and for its use and benefit, at its sole cost and expense, to make, execute and deliver any and all instruments, bills of sale, conveyances, leases, waivers, title or registration applications, certificates of ownership and other forms necessary to encumber, convey, transfer or relinquish my rights, title and interest in and to the vehicles described on <u>Attachment A</u> hereto and hereby made a part hereof.

GIVING AND GRANTING to Beneficiary full power and authority to do and perform every act requisite and necessary to the powers granted above, as fully and to all intents and purposes as it might or could do if personally present, hereby ratifying and confirming all that Beneficiary shall lawfully do or cause to be done by virtue of this power.

Date: _____, 2021

TPINE LEASING CAPITAL L.P.

By:_____
Name:_____
Title:_____

STATE OF _____)
                                )
COUNTY OF _____)

On this _____ day of _____, 2021 before me, the undersigned notary public, personally appeared _____, personally known to me, as _____ for TPine Leasing Capital L.P., to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (s)he signed it voluntarily for its stated purpose.

_____
Notary Public

My Commission Expires:

_____
[SEAL]

2580803v2

**Attachment A**
**To Special Power of Attorney**
**(Vehicle Titling Agency)**

**[INSERT VEHICLE DESCRIPTION]**

2580803v2